Present: All the Justices

RICHMOND, FREDERICKSBURG
& POTOMAC RAILROAD
COMPANY, ET AL.

                      OPINION BY JUSTICE A. CHRISTIAN COMPTON
v.  Record No. 950799            March 1, 1996

METROPOLITAN WASHINGTON
AIRPORTS AUTHORITY

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Paul F. Sheridan, Judge

In this inverse condemnation case, a landowner seeks a determination in a declaratory judgment proceeding under Code § 8.01-187 that its private property has been taken or damaged for public use without just compensation, within the meaning of Article I, Section 11 of the Constitution of Virginia.

Appellants Richmond, Fredericksburg & Potomac Railroad Company and RF&P Properties, Inc. (collectively RF&P), instituted this action as of July 1, 1992 against appellee Metropolitan Washington Airports Authority. The Authority, an interstate compact entity with the District of Columbia, was created in 1985 to acquire Washington National Airport and Washington Dulles International Airport from the federal government and to operate the respective facilities. Acts 1985, ch. 598. The Authority has the power of eminent domain. Id. § 9.

The subject property is a tract of approximately 41 acres owned by RF&P in Arlington County. The land lies north of Crystal City and lies adjacent on the north northwest to National Airport. About 17 acres of the property lie in the "clear zone" of the Airport's Runway 15/33.

A clear zone, also called a "runway protection zone," is an area at ground level in which the Federal Aviation Administration (FAA) prohibits any development that would attract a "congregation of people."  The type of development prohibited in airport clear zones includes office buildings and shopping centers.  The clear zone for this runway was designated by the FAA as an area at ground level in the shape of a trapezoid, beginning 200 feet from the end of the runway with a base width of 1,000 feet, extending out for 1,700 feet to an outer width of 1,425 feet.

In an amended motion for judgment, RF&P alleged that the Authority, in order to qualify for grant funds under certain federal statutes, was required to give assurances to the FAA that it would obtain either a fee interest "or a strict land use and avigation easement" over National Airport's clear zone.  The RF&P alleged that because National Airport was federally owned and operated until 1987, when the Authority began the Airport's operation, it had no occasion before that time to participate in the various federal grant programs, and thus was not bound to "enforce" the FAA's clear zone policy.  The RF&P alleged that after the Authority assumed operating control over the Airport, the Authority became obligated to "implement" the FAA's clear zone policy in order to be eligible for federal funding.

The RF&P further alleged that the subject property is zoned by the County for industrial development, designated M-1 and M-2.

It asserted that the property's highest and best use is for operation of commercial office buildings, noting that Crystal City office space has a low vacancy rate because of its proximity to the Pentagon and downtown Washington, D.C.

The RF&P further alleged that it entered into a joint venture agreement in 1986 with the Charles E. Smith Companies to develop an office complex on the subject property. (References in this opinion to "RF&P" in connection with efforts to develop the property will include the Smith Companies.) In the beginning, ten office buildings were planned, as well as construction of above and below ground parking, sidewalks, driveways, and street lighting.

The RF&P further alleged that, beginning in October 1986, it commenced filing the appropriate documents with the FAA seeking a "no hazard determination," that is, a ruling that its building proposal did not constitute a hazard to air navigation. According to the allegations, the FAA conducted studies and found that a majority of the proposed buildings exceeded FAA height limitations. But the FAA said that even if the building heights were lowered, it would still object to the proposed development because it would introduce a congregation of people into the clear zone.

The RF&P also asserted that it submitted revised proposals to the FAA in July 1987, January 1988, and August 1988. In the final proposal, no occupied buildings were in the clear zone,

only a local access road, surface and underground parking, trees, and lights.  Finally, RF&P asserted, the FAA issued a "no hazard determination" in September 1988 to expire in March 1990.

The RF&P also alleged that at the time it "was being pressured by the FAA to cancel its plans for development in the Clear Zone," another landowner began formulating its own plans for development in the immediate area.  Vector-Schafran, a partnership, owned a one-acre parcel adjacent to the subject property; almost all of the one acre is within the clear zone. In September 1988, according to the allegations, after Vector-Schafran submitted revised plans, the FAA issued a no hazard determination but said it discouraged development because a congregation of people would be introduced into the clear zone.

The RF&P further alleged that in mid-1988 the Authority "had resisted the FAA's pressure to force it to obtain property interests sufficient to control the Clear Zone."  But, RF&P asserted, this resistance "began to erode in late 1988."  The RF&P asserted the Authority then began to implement a plan for "massive redevelopment" of National Airport.  Under the federal funding statutes, according to the allegations, the Authority was eligible to receive 75 per cent of the costs for certain aspects of the redevelopment from the FAA.  Thus, RF&P alleged, the proposed developments by it and Vector-Schafran caused the FAA "to exert increasing pressure" on the Authority to acquire either fee interests or land and avigation easements in the clear zone.

As a result, RF&P asserted, a conditional letter of intent was executed on September 30, 1989 between RF&P and the Authority. In the letter, according to the allegations, RF&P "promised to convey a strict use easement" to the Authority upon commencement of the development. The proposed easement, RF&P asserted, did not permit development in the clear zone, except for roadways, parking, street lighting and "infrastructure support." The letter provided that it would terminate if the RF&P determined not to proceed with the development.

Subsequently, RF&P alleged, the Authority applied for federal grant funds, giving "assurances" in grant agreements in 1990, 1991, and 1992 that it would obtain land use and avigation easements over the clear zone portion of RF&P's property.

The RF&P further alleged that, after the FAA approved its revised plan in September 1988, RF&P attempted to make the development plan "economically viable." It alleged that because of the Authority's "obligation to prevent viable development in the Clear Zone," RF&P was not able to "implement" its plan. The September 1989 letter of intent "lapsed," RF&P alleged, when it determined that the development could not proceed and, at that time, "a date no later than November 1991," RF&P was returned to its "status immediately prior to the execution of the letter of intent."

Further, RF&P alleged, the Authority, through delay of initiation of condemnation proceedings, attempted to "drive down"

the value of the Vector-Schafran property.  In 1992, RF&P asserted, the Authority condemned the property and took fee title to it.

Articulating its inverse condemnation claim in the amended motion for judgment, RF&P alleged that when the conditional letter of intent lapsed, the Authority "was obligated by applicable law either to negotiate just compensation with [the RF&P] or to determine just compensation through formal condemnation proceedings."  Continuing, RF&P asserted that the Authority "has not negotiated such just compensation, has not initiated such condemnation proceedings, and has not returned its [federal] funding to the FAA."

The inverse condemnation action included a so-called "overflights" claim in addition to the claim that the Authority was "using" the subject property as a clear zone at ground level.  The RF&P alleged the Authority has taken RF&P's "airspace for its own use," asserting that "the frequency of flights" over RF&P's property "increased from 1989 to 1990" and that this use "has caused noise, vibrations, fumes, dust and fuel particulates emissions on the Property."

The RF&P alleged that the Authority's "actions" regarding the overflights and the use of the clear zone have resulted in a taking of the property in the clear zone.  It also asserted that the taking occurred on or about October 20, 1989, or in the alternative, at such time as the Authority executed its first

grant agreement for federal funds for National Airport.  Thus, RF&P sought a declaration that a taking had occurred on the date alleged, sought the appointment of commissioners to determine the compensation to which it is entitled, and sought an award of costs and attorney's fees.

Subsequently, the trial court overruled demurrers filed by the Authority to the amended motion for judgment.  In a February 1994 order memorializing that ruling, the court concluded that RF&P had made allegations sufficient to state "a takings and/or damage claim based on overflights of aircraft," and a "separate inverse condemnation claim based on [the Authority's] alleged actions with respect to the purported imposition of the `clear zone' allegedly causing damages and/or a taking" of the RF&P's property.

Later, the Authority filed a motion for partial summary judgment directed to the overflights claim.  The Authority argued that the claim was barred by the three-year statute of limitations applicable to inverse condemnation actions.  See Prendergast v. Northern Virginia Regional Park Auth., 227 Va. 190, 194-95, 313 S.E.2d 399, 402 (1984).  The Authority asserted that RF&P, limited by the trial court to evidence of overflights already developed during discovery, was unable to establish that flights over the subject property had increased in frequency or changed in character during the three-year period prior to the date the action was instituted, that is, between July 1, 1989 and

July 1, 1992.

Following argument in November 1994, the trial court granted the motion. The court ruled that, "as a severable cause of action, the overflight issue is barred by the statute of limitations." The trial court indicated at the time of this ruling, however, that overflights evidence would probably be admissible on the "other alleged takings" claim.

Subsequently, following a six-day bench trial in which the testimony of 18 witnesses was presented and more than 100 exhibits were considered, the trial judge asked the parties to submit proposed findings of fact and conclusions of law. After conducting a thorough review of the parties' proposals, the judge revised, deleted, and adopted language to articulate precisely the facts that he found from all the evidence adduced at trial.

The trial judge, in a 57-page document, ruled in favor of the Authority. He made 87 findings of fact, adopted 71 conclusions of law (many of which also contain factual findings), and set forth a summary of his reasoning underlying the findings and conclusions. The court held that the Authority did nothing to take or damage RF&P's property. In an alternative holding, the court held that even if a taking or damage had been established, the clear-zone claim was time-barred. The trial court incorporated the document in a January 1995 order entering judgment for the Authority. The RF&P appeals.

Although some of the evidence was conflicting, RF&P

understandably does not challenge on appeal any of the trial court's detailed findings of fact. Indeed, on brief RF&P says, "None of the central facts in this case [is] in dispute." Therefore, applying settled appellate principles, we shall recite the evidence, and all reasonable inferences flowing from the evidence, in a light most favorable to the Authority which prevailed in the trial court. Additionally, we shall recite the voluminous evidence in summary fashion and in no more detail than is necessary to illuminate the questions of law presented.

In June 1986, when the RF&P and the Smith Companies agreed to explore development of the subject property, they knew about a planned consolidation of Navy Department offices in the area. The hope was that a development on the property could be offered in response to an expected Navy Solicitation for Offers (SFO).

During the period after the Authority was created and before the RF&P finally obtained a no hazard determination from the FAA, there was an ongoing debate between the Authority and the FAA whether the Authority was legally required, based on federal regulations, to acquire appropriate property interests in the Runway 15/33 clear zone as a condition for receipt of federal funding. William A. Whittle, manager of the FAA's Washington Airports District Office, was of opinion that the Authority was required to acquire such interests. The Authority's general manager took the position there was no such requirement.

After RF&P's July 1987 revised submission, when it had been

advised of the dimensions and location of the clear zone, RF&P volunteered to the FAA that it would grant an avigation easement to the Authority over a portion of the clear zone. An officer of the Smith Companies testified, "we felt that this was a political move for us to be making. That we could resolve the issues here by our willingness to give control to the Airports Authority."

Just prior to RF&P's third submission to the FAA, representatives of RF&P met with representatives of the Authority in November 1987 seeking formal support for the proposed development. The RF&P offered to grant the Authority an avigation easement over the clear zone in exchange for support, and the Authority agreed. When RF&P submitted its revised plan in January 1988, it formally proffered to the FAA its intent to grant an easement to the Authority over the entire clear zone. At the time, RF&P's counsel contended that the Authority was not legally obligated to acquire the clear zone as a condition for receipt of federal funding.

In February 1988, the FAA, in a "Current Issues Report," stated its intent to "pressure" the Authority to acquire interests in the clear zone. In a similar report issued two months later, the FAA reported that the Authority had not acceded to FAA pressure to acquire such interests.

In August 1988, the FAA sent RF&P a qualified no hazard letter stating that its most recent submission did not violate FAA height restrictions; it expressed opposition to the proposed

construction, however, because two buildings were still planned for the clear zone.  In the letter, the FAA admitted, however, that it had no legal basis to prohibit the development because the Authority "does not have control of the area in question."

After receiving this qualified no hazard determination, RF&P decided it could not move forward with the development. Specifically, RF&P feared it would not be able to obtain zoning approval or a building permit from the County because of the FAA's reservations expressed in the August letter; it would not be able to obtain financing and insurance due to the FAA's reservations about proposed construction in the clear zone; and it might receive adverse publicity and suffer substantial harm to its reputation were it to ignore the FAA's admonition.

Later in August 1988, RF&P submitted another revised proposal.  It called for construction of six buildings, all outside the clear zone.  The revision included the same proffer to grant the avigation easement contained in the prior submission.  Subsequently, the FAA issued an unqualified no hazard letter to RF&P approving the last submission.

On September 1, 1988, Vector-Schafran submitted to the FAA a notice of proposed construction for an office building on its one-acre parcel.  In November 1988, the FAA notified Vector-Schafran that its proposed building violated its clear zone policy.

During April and May 1989, the Authority supported the

RF&P's efforts to move forward with its development. Among other things, the Authority resisted the effort of the "National Capital Planning Commission" to adopt its own clear zone policy to include property beyond 1,900 feet from the end of Runway 15/33.

Following negotiations during July, August, and September 1989, the parties executed the conditional Letter of Intent to Grant Easement on September 30, 1989. The Authority agreed to acquire for $2,000 the avigation easement conditionally offered by the RF&P. The letter of intent was revocable at the will of RF&P and was expressly conditioned on RF&P's ability to obtain all necessary government approvals for development. Later, RF&P "terminated" the letter.

In October 1989, the Defense Department, Navy Department, and General Services Administration issued an SFO seeking three million square feet of office space to house consolidated Navy command offices in a single development. The RF&P recognized that the foregoing entities would not consider the subject property because so much of it was inside the clear zone, fixed by the Navy at 3,000 feet in length.

When RF&P recognized that the government was not interested in the subject property, it became concerned the Navy might leave existing office space that it was occupying in Crystal City and consolidate elsewhere, causing many other Crystal City tenants to leave as well. According to an officer of the Smith Companies,

"a great deal of vacated office space in the Crystal City area
. . . would have meant that any venture into a new development
would have been foolhardy." Therefore, RF&P abandoned its plans
to proceed with the development of a speculative office complex
on the subject property.

In March 1991, Hydrosystems, Inc., completed a report of
investigation requested by RF&P relating to contamination of
about six acres of the subject property (four of which are in the
clear zone). The investigation, conducted in cooperation with
the Virginia Department of Waste Management, revealed severe
contamination in the soil and groundwater.

In April 1991, the Authority filed its petition to condemn
the Vector-Schafran property which culminated in a purchase
agreement to transfer the property to the Authority in December
1992.

In October 1991, RF&P granted CSX Transportation, Inc., a
permanent easement for use of a railroad corridor. Of the 17
acres in the clear zone, five are within the corridor. The
easement prohibits RF&P from building in the corridor.

The RF&P continues to earn substantial profits from
commercial leases on the subject property. Over $600,000 annual
net rental income was earned during the year before and during
the year following the alleged taking. Also, the evidence shows
that the clear zone property retains significant market value for
uses that do not conflict with the FAA clear zone policy. If

only used for parking, the property is worth $400,000 to $450,000 per acre.

There are other factors which affect the economic viability of development of the subject property. For example, the railroad corridor is further encumbered by a 1938 Indenture in favor of the United States which provides, in part, that ownership of the corridor will revert to the United States in the event the corridor is used for any purpose other than railroad operations. Also, approximately 5.5 acres of the subject property is leased to the Solite Corporation, which operates a concrete batching plant on the land. The lease does not expire until April 2000. The majority of the 5.5 acres is in the clear zone. Additionally, because of a high water table on the subject property, a large amount of subsurface parking would be so expensive to provide as to question the economic return on office development. Also, development of the four acres of contaminated land would be "impossible" without appropriate remediation efforts costing millions of dollars.

Finally, the trial court stated that it did not find the subject property had "a negative development potential," but that it had some value for purposes of liability in an inverse condemnation action.

In its conclusions of law, the trial court ruled that the Authority did "nothing" to take or damage RF&P's property. Also, the court ruled that the Authority was not legally obligated "to

do anything" with respect to the property, because FAA policy does not require the Authority to acquire control over property within the Runway 15/33 clear zone.

Additionally, the court decided that RF&P has suffered no compensable interference with its property rights. The court noted that RF&P's claim is primarily based on the allegation that the FAA clear zone policy has frustrated its plans to place an office development on the property, but it "does not -- and cannot -- claim that the FAA clear zone interferes with the present uses of the property."

Finally, the trial court determined that even if the RF&P had established a taking, its claim against the Authority would be time-barred.

On appeal, the RF&P assigns the following errors: the trial court erred in holding that the Authority did nothing to take or damage RF&P's property within the meaning of Article I, Section 11 of the Constitution; the trial court erred in holding that, even if it had established a taking or damage, the clear-zone claim was time-barred; and the trial court erred in holding that the separate "overflights" claim was time-barred. Because of the view we take of the merits of RF&P's inverse condemnation claim, we do not reach the statute of limitations questions.

When a case is decided by a trial court without the intervention of a jury, the court's judgment will not be set aside "unless it appears from the evidence that such judgment is

plainly wrong or without evidence to support it." Code § 8.01-680. The trial court's ruling on the merits is fully supported by the evidence.

Article I, Section 11 of the Constitution of Virginia provides that the General Assembly shall not pass any law "whereby private property shall be taken or damaged for public uses, without just compensation." This section is self-executing and permits the landowner to enforce its constitutional right to compensation in a common law action based upon implied contract, Burns v. Board of Supervisors of Fairfax County, 218 Va. 625, 627, 238 S.E.2d 823, 825 (1977), both where the property is taken for public use and where it is damaged for public use. Jenkins v. County of Shenandoah, 246 Va. 467, 470, 436 S.E.2d 607, 609 (1993).

In the present case, we hold RF&P failed to establish that any taking or damage by the Authority occurred, either any taking or damage of the land within the clear zone or any taking or damage of the airspace above the clear zone.

The gist of the RF&P's claim is that actions of the Authority prevented it from developing the subject property. Upon the clear zone aspect of the claim, RF&P asserts the Authority had committed to acquire the property as a requirement for federal funding. The trial court properly concluded, however, that no such requirement existed. The court found that the opinion to the contrary of the FAA's Whittle was unsupported

- 16 -

by other FAA testimony. Indeed, the Authority constantly resisted pressure from the FAA to acquire the clear zone property, finally accepting RF&P's offer to sell for $2,000 an easement over the clear zone. Furthermore, the September 1989 conditional letter of intent, which would have allowed use of the clear zone to support RF&P's non-clear zone land, was purely voluntary on RF&P's part. Significantly, the trial court found that the Authority's acts taken subsequent to execution of the letter of intent, including acquisition of Vector-Schafran's parcel, did not constitute a commitment to acquire RF&P's land.

Furthermore, the record is clear that the Authority did not take RF&P's land by "using" it, either for overflights or as a runway protection zone. Relating to the overflights, the record merely shows that, since at least 1984, approximately 23,000 aircraft annually have flown over the property using Runway 15/33. During a pretrial hearing, RF&P's attorney stated to the trial court that RF&P had no additional evidence to support its overflights claim. Subsequently, RF&P never offered, or attempted to offer, any evidence about, for example, the types of aircraft using the runway, the height at which they passed over the property, or the frequency of landings, to support its allegations in the amended motion for judgment that overflights caused "noise, vibrations, fumes, dust and fuel particulates emissions on the Property." "Flights over private land are not a taking, unless they are so low and so frequent as to be a direct

and immediate interference with the enjoyment and use of the land." United States v. Causby, 328 U.S. 256, 266 (1946). Manifestly, there has been no showing that an invasion of the RF&P's airspace rights occurred. And, the clear zone requirements of the Navy and the National Capital Planning Commission, relied on by RF&P, do not dictate a different conclusion.

Relating to the alleged "use" of the clear zone, the crux of RF&P's claim is found in paragraph 83 of the amended motion for judgment. It alleged that the Authority had inversely condemned 17 acres of its land when the Authority "represented and warranted to the FAA . . . that it had control over [RF&P's] Property," or alternatively, when the Authority executed grant agreements for federal funds. As a result, the allegation continued, the Authority "became bound by applicable law either to condemn the portion of [RF&P's] Property located in the Clear Zone, or obtain strict land use and avigation easements for that portion of the Property."

Actually, this is a contention that the Authority "used" the clear zone because it allegedly prevented RF&P from developing office buildings on the property. The record fully supports the trial court's holding that the Authority took no action to prevent the development nor did it threaten RF&P with condemnation. On the contrary, the record shows that the Authority actively assisted the RF&P's development efforts. The

record is clear that RF&P abandoned its plans for the commercial development due to adverse market conditions and physical problems with the property, not because of any interference by the Authority.

Finally, we have not overlooked the fact that, because of its statute of limitations ruling on the overflights claim, the trial court did not explicitly address the merits of that claim after hearing all the evidence. Even if we were to agree with RF&P that the trial court erred in ruling the claim was time-barred, reversal of the judgment is not required. "We do not hesitate, in a proper case, where the correct conclusion has been reached but the wrong reason given, to sustain the result and assign the right ground." Robbins v. Grimes, 211 Va. 97, 100, 175 S.E.2d 246, 248 (1970). Accord Doswell Ltd. Partnership v. Virginia Elec. & Power Co., 251 Va. ___, ___, ___ S.E.2d ___, ___ (1996), decided today. This is such a case.

Consequently, we hold there is no reversible error in the judgment of the trial court, and it will be

Affirmed.