Present: Carrico, C.J., Compton, Stephenson, Lacy, Keenan and
Koontz, JJ., and Cochran, Retired Justice

DOSWELL LIMITED PARTNERSHIP
                              OPINION BY JUSTICE A. CHRISTIAN COMPTON
v.  Record No. 951027                    March 1, 1996

VIRGINIA ELECTRIC AND POWER COMPANY


          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                    Randall G. Johnson, Judge


     In this breach of contract action, the dispositive issue is
whether the trial court erred in ruling that the disputed portion
of a written agreement is clear and unambiguous, thus precluding
consideration of extrinsic evidence supporting one party's
interpretation of the document.

     In March 1993, appellant Doswell Limited Partnership
(Doswell) filed this action against Virginia Electric and Power
Company (Virginia Power) for breach of contract.  In a second
amended motion for judgment, Doswell sought damages for Virginia
Power's alleged breach in the principal amount of $10,317,250.23.

     The following basic facts are shown by the record, including
the pleadings, and furnish part of the background for this
controversy.  Doswell, a Virginia limited partnership with its
principal office in Los Angeles, California and affiliated with
the Mitsubishi Corporation, is an independent power producer that
owns and operates two natural gas-fired electrical generating
units located near the community of Doswell in Hanover County.
Virginia Power is a public utility that provides electrical
service to its customers.

     In 1986, Virginia Power issued a solicitation to purchase

electricity from independent power producers through contracts that would base payments on the costs that Virginia Power would avoid by not building a new power plant and producing the power itself.  In 1987, it entered into two written agreements with Intercontinental Energy Corporation to purchase electricity from the two generating units that Intercontinental was then planning to build near the Doswell community.  The two agreements, one for each facility, were virtually identical.  For clarity, we shall refer to the two agreements as one.

On June 21, 1989, with the knowledge and consent of Virginia Power, Intercontinental assigned the agreement to Doswell, the units' present owner and operator.  In August 1989, Virginia Power offered Doswell the "option" to modify the agreement and to create a new category of payment, called the "Fixed Fuel Transportation Charge," sometimes referred to in this opinion as the "FFTC."

Subsequently, teams of negotiators representing the respective parties engaged in extensive discussions about the language to be included in the modified agreement.  These negotiations included consideration of drafts and redrafts of contract language submitted by the participants dealing with the manner in which the FFTC would be determined.

Generally, the parties agreed that Virginia Power would measure its payments to Doswell by the costs Virginia Power estimated it would incur to construct and operate one of its own

planned generating stations in Chesterfield County, known as Chesterfield 7. Those projected costs included the costs of transporting natural gas to Chesterfield 7. The costs of Chesterfield 7 would serve, in effect, as the "surrogate" or "benchmark" to measure the costs Virginia Power would avoid by purchasing power from a plant to be built and owned by Doswell.

The negotiations culminated in the execution by the parties of the contract in question, an 83-page document, on January 3, 1990. It is labelled, "First Amendment and Restatement of the Power Purchase and Operating Agreement By and Between Doswell Limited Partnership as Successor in Interest to Intercontinental Energy Corporation and The Virginia Electric and Power Company." This controversy focuses on Section 10.3 of the agreement.

In the second amended motion for judgment, Doswell alleges that Section 10.3 of the agreement requires Virginia Power to pay a Fixed Fuel Transportation Charge based on 100 per cent of the fixed costs associated with transporting natural gas through a pipeline system delivering gas to Chesterfield 7. Doswell further alleges that Virginia Power breached the contract by basing its payment on only 44 per cent of its actual fixed costs of one segment of the pipeline and on only 50 per cent of its actual fixed costs of another segment.

Doswell filed a pretrial motion seeking a declaration that it would be permitted to present parol evidence relevant to the construction of Section 10.3. Upon consideration of argument of

counsel, the court ruled "that Section 10.3 is not ambiguous" and that parol evidence would not be admitted at trial.

Later, the parties, by counsel, filed a stipulation that placed an unusual twist on the procedure at trial. In the stipulation, Virginia Power promised to waive any objection during trial to parol evidence presented by Doswell about the negotiations surrounding the agreement and another document executed by the parties in June 1990. Virginia Power reserved the right, however, to argue at the conclusion of the evidence that "the contract documents are complete and unambiguous," and to argue that the court "should not attribute any weight to such parol evidence in making its findings and rulings."

Subsequently, during four days of trial, the court, sitting without a jury, heard from 17 witnesses and considered more than 100 exhibits. Extensive parol evidence was presented by both parties.

At the conclusion, the court ruled from the bench in favor of Virginia Power, holding Doswell had not "carried its burden of proof that there was a breach of contract in this case." During the course of its oral opinion, the court adhered to its earlier ruling that "because the contract is clear and unambiguous" parol evidence "should not be considered." We awarded Doswell this appeal from a March 1995 order entering judgment for Virginia Power.

The agreement in question was negotiated and executed

against the following additional background. At the outset, it should be understood that when the agreement in question was executed in January 1990, the Doswell facility and Virginia Power's Chesterfield facility were in the planning stages and had not been built.

Both the Doswell facility and Virginia Power's Chesterfield 7 facility were to be fueled by natural gas supplied from a storage site in Pennsylvania and delivered through an interconnecting pipeline system that includes the Consolidated Natural Gas (CNG) pipeline running through northern Virginia. This pipeline feeds into a pipeline, not built at the time of the negotiations, operated by Virginia Natural Gas (VNG) running through central Virginia and into the Tidewater area.

In order to transport gas to Chesterfield 7, construction of an additional pipeline, a spur, approximately 16 miles in length was necessary. This spur is comprised of two sections: The City of Richmond (CR) pipeline, running from Mechanicsville to the James River, and the Commonwealth Gas Services (CGS) pipeline, running approximately 2,000 feet under the James River and connecting to Virginia Power's Chesterfield facility. This controversy relates to the cost allocation of the two sections of the spur.

As the reader will soon learn, the foregoing delivery system is referred to in the agreement as the "CNG/VNG/CR/CGS" pipeline system. For clarity, we shall often call it the "northern

- 5 -

pipeline."

Chesterfield 7 is located near another gas-fueled Virginia Power generating plant known as Chesterfield 8. Fuel to Chesterfield 8 was to be delivered through another pipeline system, which we shall often call the "southern pipeline." Chesterfield 7 and Chesterfield 8 connect to the two pipelines through a common header. Thus, each is capable of receiving gas from either system.

According to the provisions of the agreement that was assigned in 1989, Doswell, as we have said, was required to provide, broadly stated, electricity. There were two aspects to this obligation. First, the capacity to produce electricity whenever Virginia Power required it, called "dependable capacity." Second, the duty to physically deliver electricity "whenever called upon." Under the assigned contract, Doswell was to be paid a fixed capacity charge for this dependable capacity, assuming the proposed plant "was, in fact, available and capable of producing power." In addition, Doswell was to receive an "energy charge," a base amount for each kilowatt hour of electricity sold, for the electricity that was actually generated and delivered.

During the negotiations beginning in the summer of 1989, to fulfill the purpose of the agreement for Virginia Power to purchase Doswell's generating capacity and electricity employing the avoided cost concept, the parties agreed upon a third

category of payment.  The capacity charge and energy delivery charge would remain, but the new FFTC charge was introduced.

The discussions included consideration of the "capacity" of both the pipelines and the parties' facilities.  The maximum daily capacity of Chesterfield 7 was projected to be approximately 42,500 dekatherms.  The use of dekatherms (Dth) is a technique employed in the industry to measure the volume of natural gas; historically, it was measured in cubic feet. Virginia Power planned to reserve approximately 42,500 Dth of "firm transportation" on the northern pipeline.  This means that Virginia Power had the right to "push gas" down the pipeline without interruption and without giving priority to other users along the pipeline.  In contrast, "interruptible transportation" means the ability of a user "to move gas down the pipeline . . . subject to the availability of that pipeline capacity with other users on the pipeline" that may have priority of use.  The companies that own the pipelines charge the user for the reserved capacity.  Generally, the discussions proceeded on the basis that Virginia Power's two Chesterfield units would receive fuel from both the northern and southern pipelines, with lateral pipelines (spurs) to be constructed to "hook up" those two routes with Chesterfield 7 and Chesterfield 8, and incidentally with a third, nearby Virginia Power unit at Darbytown.

During the negotiations, the parties understood that the spur (CR/CGS) would be constructed with more capacity than needed

for Chesterfield 7. The CR section (planned to be built by the City of Richmond but ultimately built and operated by Virginia Power) has 96,000 Dth capacity. Virginia Power reserved 86,000 Dth of firm capacity on the CGS section. The parties also understood that the gas service to Chesterfield 7 would be on a firm basis, and that Chesterfield 8 and Darbytown would receive interruptible service from the northern pipeline and the spur.

Shortly after execution of the agreement in January 1990, Doswell sought construction financing from Credit Suisse. In connection with the financing, Virginia Power, Doswell, and Credit Suisse executed on June 4, 1990 a document labelled "Virginia Electric and Power Company Consent to Assignment of Agreements" (the Consent). This document evidenced Virginia Power's consent to Doswell's assignment of the January 1990 agreement to Credit Suisse as security for Doswell's repayment of a construction loan.

During negotiations preceding execution of the Consent, the parties focused on the provisions of the January 1990 agreement, including the Fixed Fuel Transportation Charge. In paragraph (13)(g) of the executed Consent, there is language dealing with the determination of the FFTC.

Subsequently, Virginia Power computed the charges due Doswell according to its interpretation of the agreement. The allocation of costs for the CR/CGS spur pipeline, as we have said, is the basis of this controversy. Because the maximum

capacity of Chesterfield 7 is 42,500 Dth and the total capacity available to it as owner of the CR section is 96,000 Dth, Virginia Power attributed only 44 per cent (42,500 divided by 96,000) of its fixed costs on the CR section to Chesterfield 7. Likewise, because Virginia Power has contracted for 86,000 Dth of firm capacity on the CGS section, with the maximum capacity of Chesterfield 7 being 42,500 Dth, Virginia Power attributed only 49.4 percent, rounded to 50 per cent, (42,500 divided by 86,000) of its fixed costs on the CGS section to Chesterfield 7.

Doswell disagreed with Virginia Power's computation, insisting on 100 per cent of the actual fixed costs on both the CR and CGS sections.  This action ensued.

On appeal, Doswell contends that the trial court erred in ruling that Section 10.3 is unambiguous and constituted the complete agreement between the parties, and "in failing to consider parol or extrinsic evidence showing the entirety of the agreement."  Also, Doswell contends that the trial court erred in "ignoring" testimony it presented of trade custom and usage in the gas pipeline industry with respect to the meaning of certain phrases defining the FFTC.  Additionally, Doswell contends the trial court erred in relying on the Consent, which it says was extrinsic evidence offered by Virginia Power.  Finally, Doswell contends the trial court erred in concluding it "had not carried its burden of proof to establish that it was entitled to recover 100% of the fixed costs associated with transporting gas through

the Spur delivery system to its sole `firm' user, Chesterfield 7, and that Doswell was only entitled to 44% of the fixed costs of one portion of the Spur and 50% of another as a matter of law."

Urging affirmance, Virginia Power argues the agreement and the Consent comprise an integrated contract that the trial court properly read together. Alternatively, it argues that the agreement is unambiguous, even without consideration of the Consent. Finally, it argues that the trial court was not required "to accord controlling weight" to Doswell's evidence of trade usage.

Because of the view we take of the ambiguity issue, it is unnecessary for us to determine whether the agreement and the Consent constitute an integrated document. The principle debated is that when parties have entered into two documents relating to a business transaction, the writings will be construed together to determine the parties' intent. Daugherty v. Diment, 238 Va. 520, 524, 385 S.E.2d 572, 574 (1989); J.M. Turner & Co. v. Delaney, 211 Va. 168, 171, 176 S.E.2d 422, 425 (1970). See Dime Deposit & Discount Bank v. Wescott, 113 Va. 567, 573, 75 S.E. 179, 182 (1912). The reason we do not address this issue is that we hold the agreement is clear and unambiguous without reference to the Consent.

"Parol evidence of prior or contemporaneous oral negotiations are generally inadmissible to alter, contradict, or explain the terms of a written instrument provided the document

is complete, unambiguous, and unconditional." Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner, 225 Va. 508, 515, 303 S.E.2d 894, 898 (1983).  "An ambiguity exists when language admits of being understood in more than one way or refers to two or more things at the same time."  Id.; Berry v. Klinger, 225 Va. 201, 207, 300 S.E.2d 792, 796 (1983).

The question whether an agreement is ambiguous is not one of fact but one of law, and the function of the court is to construe the contract made by the parties, not to make a contract for them.  Wilson v. Holyfield, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984).  Contracts are not rendered ambiguous merely because the parties or their attorneys disagree upon the meaning of the language employed to express the agreement.  Id.  Even though an agreement may have been drawn unartfully, the court must construe the language as written if its parts can be read together without conflict.  Berry, 225 Va. at 208, 300 S.E.2d at 796.

And, parol evidence may not be used to first create an ambiguity and then to remove it.  Cohan v. Thurston, 223 Va. 523, 525, 292 S.E.2d 45, 46 (1982).  Finally, an agreement is not rendered ambiguous merely because it deals with a technical subject that may be considered complex to the uninformed lay person who is not familiar with the topic.

Guided by these settled principles, we turn to the center of this controversy, Section 10.3(a) of the agreement, included within Article X of the document labelled "Compensation, Payment,

and Billings."  Section 10.3(a) provides as follows:

"10.3  (a) Operator [Doswell] shall be compensated by Virginia Power for the fixed transportation charges associated with transporting gas to Chesterfield 7 through the use of the Fixed Fuel Transportation Charge.  The Fixed Fuel Transportation Charge ($/kW/Month) shall be determined on a Monthly basis using the following equation:

$$\text{Fixed Fuel Transportation Charge} = \frac{\text{CNG/VNG/CR/CGS Transportation Fixed Charges}}{214,000 \ [\text{kW}]}$$

The CNG/VNG/CR/CGS Transportation Fixed Charges shall be determined on a Monthly basis and shall be equal to all costs associated with natural gas transportation and storage that do not vary with the volume of gas consumed at Chesterfield 7 for the Month in question. Fixed costs for natural gas transportation and storage shall include demand charges for natural gas pipeline transportation, pipeline operation and maintenance, and demand and capacity charges for natural gas storage services.  The CNG/VNG/CR/CGS Transportation Fixed Charges shall be based on all the fixed costs associated with transporting gas through the CNG/VNG/CR/CGS delivery system.  In determining the CNG/VNG/CR/CGS Transportation Fixed Charges, any discount prices received by Virginia Power for transporting gas through such delivery system through settlement of litigation and not applicable to Operator shall be adjusted to offset the effect of such discount.  Any retroactive adjustments based on changes in the tariffs shall be included in the current Month's CNG/VNG/CR/CGS Transportation Fixed Charges.  An example calculation for determining the Fixed Fuel Transportation Charge is shown in Exhibit B."

Plainly, Section 10.3(a) limits the fixed costs to be used in computing the FFTC payment to those costs associated with transporting natural gas to Chesterfield 7.  The first sentence of 10.3(a) clearly states that Doswell "shall be compensated by Virginia Power for the fixed transportation charges associated with transporting gas to Chesterfield 7 through the use of the

Fixed Fuel Transportation Charge."  The third sentence of 10.3(a) provides that the charges to be used to compute monthly the FFTC payment "shall be equal to all costs associated with natural gas transportation and storage that do not vary with the volume of gas consumed at Chesterfield 7 for the Month in question."

The calculation example for determining the FFTC included in Exhibit B, referenced in the last sentence of 10.3(a), confirms that the FFTC payment is limited to Chesterfield 7's costs, and does not include 100 per cent of Virginia Power's fixed costs on the CR and CGS pipelines.  The example contains estimates of the CNG and VNG portions of the payment.  These estimates are limited by certain assumptions in the example to the fixed costs associated with transporting that volume of gas equal to the maximum daily capacity of Chesterfield 7, assumed to be 43,000 Dth in the example.  Nowhere does the agreement provide that the CR and CGS portions of the FFTC payment should be computed differently.

As the calculation example makes clear, the denominator in the equation, 214,000 kW, represents Chesterfield 7's capacity in terms of producing electricity, not accepting fuel.  As demonstrated in the example, the equation, by employing the denominator, tabulates the monthly payment on a per kilowatt basis.

Doswell implicitly argues, however, that even if the agreement, standing alone, is unambiguous, the judgment must be

reversed because the trial court considered the Consent, which Doswell says is extrinsic evidence.  We do not agree that the judgment should be reversed.

Apparently, the trial court, in making its pretrial ruling, considered the Consent.  In the letter to counsel announcing the ruling, the court said, "After again reviewing Section 10.3 of the Amended Agreements, the Consent to Assignment of Agreements, and your arguments, I am of the opinion that Section 10.3 is not ambiguous."

At the trial held ten months later, however, and when final judgment was pronounced, the record shows that the trial court did not give controlling consideration to the Consent.  During its oral opinion, the court, in first discussing the agreement, plainly stated that Section 10.3 "is clear and unambiguous" and that parol evidence should not be considered.  Later during its comments, the court said, "If that [the agreement] were not clear enough in and of itself, it's made even more clear, if that's possible, in the Consent."  Thus, even assuming the Consent qualifies as prohibited extrinsic evidence, the record shows that the trial court based its judgment primarily on the agreement, including Section 10.3.  But even if the court erroneously considered the Consent, we will affirm the judgment because the court reached the correct conclusion arguably for the wrong reason.  Robbins v. Grimes, 211 Va. 97, 100, 175 S.E.2d 246, 248 (1970).  Accord Richmond, Fredericksburg & Potomac R.R. v.

- 14 -

<u>Metropolitan Washington Airports Auth.</u>, 251 Va. \_\_\_, \_\_\_, \_\_\_S.E.2d \_\_\_, \_\_\_ (1996), decided today.

Finally, we reject Doswell's contention that the trial court erroneously "ignored" testimony it presented of trade custom and usage with respect to the meaning of certain contract terms defining the FFTC. Evidence that contract phrases or terms have acquired, by custom in the locality, or by usage of the trade, a peculiar meaning not attached to them in their ordinary use is admissible even though the phrases or terms themselves are unambiguous. <u>Richlands Flint Glass Co.</u> v. <u>Hiltebeitel</u>, 92 Va. 91, 94-95, 22 S.E. 806, 807 (1895). <u>See</u> Code § 8.2-202(a) (terms in commercial sales agreements may be explained or supplemented by course of dealing or usage of trade evidence).

But Doswell has not referred us to any specific part of the record to support its claim that such evidence was "ignored" by the trial court, and we have found no support for Doswell's conclusion. Moreover, the trial court was not required to accept such evidence that was contradicted by other evidence in the record and that related to usage in a separate business, that is, the formula the Federal Energy Regulatory Commission uses to fix rates operators of interstate natural gas pipelines may charge their customers.

Consequently, we hold there is no reversible error in the judgment below and it will be

<u>Affirmed.</u>