COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Russell and AtLee
Argued at Fredericksburg, Virginia

HENRY F. BRANDENSTEIN, JR.

MEMORANDUM OPINION[*] BY
v.        Record No. 0249-15-4        JUDGE WESLEY G. RUSSELL, JR.
                                      OCTOBER 20, 2015

JANET R. BRANDENSTEIN

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Lorraine Nordlund, Judge

John H. Kitzmann (Kim M. Mattingly; Davidson & Kitzmann, PLC,
on briefs), for appellant.

David L. Duff (The Duff Law Firm, on brief), for appellee.


Appellant Henry F. Brandenstein, Jr. ("husband") appeals from a January 23, 2015 order of the circuit court finding him "in civil contempt for his unilateral modification of spousal support . . ." and setting a support arrearage consistent with the circuit court's finding that the spousal support provisions of the marital settlement agreement were not self-executing. Husband argues that, because the support provisions of the marital settlement agreement were self-executing, the changed support payments he made were consistent with the parties' marital settlement agreement and the final order of divorce, and therefore, there was no support arrearage to determine and he was not in contempt of the circuit court's prior order. For the reasons that follow, we agree with husband and reverse the decision of the circuit court.

_____
[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

The parties were divorced by final decree dated July 21, 2011. The decree incorporated the parties' July 16, 2010 marital settlement agreement, which provided that husband was to pay wife $6,000 per month spousal support from August 2010 until December 2010. For the two-year period thereafter, husband was required to pay $8,000 in monthly support. The parties' agreement then provides that beginning January 26, 2013, and then each month thereafter, "the Husband shall pay to the wife, as modifiable spousal support, the sum of [] $8,000.00 per month, which amount shall be adjusted annually retroactively to January 26th of each subsequent year . . . either upwards or downwards."

The agreement specifies that the annual adjustment is to be made "based upon a comparison of the Husband's 2009 income from W-2 salary and K-1 flow through income . . . and his income from his W-2 salary and K-1 flow through income for the year ending December 31st immediately prior to the recalculation for the following year . . . ."[1] No capital gains income or other income not related to wages, bonuses or other employment-related compensation is to be considered when calculating the adjustment. The agreement expressly provides that appellant's 2009 income was "$544,417," which is the amount located in Box 1, "Ordinary business income," of appellant's 2009 K-1. Pursuant to the agreement, the amount of support, beginning with payment due January 26 each year, then is adjusted, upwards or downwards, "in the same percentage as the difference

---

[1] At all relevant times, husband has been a partner at a national law firm that is organized as a limited liability partnership. Accordingly, he has not had any W-2 wages. From the proceedings below, it appears that the parties included the reference to W-2 wages in the agreement to cover a situation where husband ceased being a partner and became an employee, whether at his present firm or at a different one.

between the two years being compared . . . ," for the twelve months of payments.[2]  The agreement then provides example calculations as to how the established formula would be implemented.  The parties further agreed that spousal support neither will exceed $11,000 nor be less than $5,000, with an exception to the floor in the event husband suffers a condition rendering him unable to earn an income.  Under the terms of the agreement, husband's support obligation would terminate upon death of either party, remarriage or cohabitation of the wife, or 150 consecutive payments by husband to wife.

In 2013, without involvement of the circuit court, husband, based on Box 1 of his 2012 K-1, increased his support payments and paid appellee $8,352 a month in spousal support.  He arrived at this figure by applying the formula set forth in the parties' agreement.  Specifically, he divided his flow through income as reported in Box 1 of his 2012 K-1 ($568,623) by his flow through income as reported in Box 1 of his 2009 K-1 ($544,417).  This calculation provided the multiplier that allowed husband to calculate the increased support payment.

The data necessary to apply the formula to determine the new payment for 2013 was not available as of January 26, 2013.  Accordingly, husband continued to pay wife the $8,000 per month required by the agreement.  Once the data for tax year 2012 became available, husband adjusted the payment upward and, consistent with the agreement, made a lump sum payment to wife of the difference between the $8,352 owed for January through May 2013 and the $8,000 he had paid in those months pending the receipt of the data to perform the adjustment.

---

[2] The agreement further provided that

> [t]o the extent that any documentation required to make the computation of the adjustment of the spousal support obligation is not available to the Husband by January 26th of any year then the spousal support amount payable from the previous year shall continue to be paid by the Husband to the Wife until such time as the documentation required to make the computation of the adjustment of the spousal support obligation becomes available.

Appellant continued to pay the $8,352 as support through the first three months of 2014. Once he obtained the data for tax year 2013, husband, again without involvement of the court, applied the spousal support formula as he had done the previous year. Specifically, he divided his flow through income as reported in Box 1 of his 2013 K-1 ($129,941) by his flow through income as reported in Box 1 of his 2009 K-1 ($544,417). This calculation resulted in a multiplier that resulted in a significantly decreased support payment.[3]

Because the support payment husband calculated under the formula fell below the agreement's $5,000 floor, husband concluded that he owed wife $5,000 a month in support for 2014. He requested that, consistent with the agreement and the parties' performance in the prior year, wife provide him a refund of his overpayments for January, February and March 2014, months in which he had paid the prior year's amount.

Specifically, husband claimed that, under the formula, the support payments for January, February, and March 2014 should have been $5,000, and therefore, he had overpaid by $3,352 a month for those three months. Accordingly, much as he had been obligated to pay wife in 2013 for underpayments in the months before the 2013 calculation could be completed, husband demanded that wife refund the overpayments, totaling $10,056, for the three months of 2014 that had passed before the 2014 calculation could be completed.

In April 2014, husband, while seeking the refund, paid wife $5,000 in support, which was consistent with the floor amount specified in the parties' agreement. When no such refund was forthcoming, he claimed a credit of the difference between the amount paid and the $5,000 floor.

_____

[3] The significant change in husband's flow through income as reported on Box 1 of his 2013 K-1was due to a change his employer made regarding its accounting method. Specifically, the employer switched from accrual accounting to the cash basis method. As a result, the flow through income reported in Box 1 of the K-1s for the employer's partners, including husband, was greatly reduced for tax year 2013. The evidence in the proceedings below established that husband played no role in the employer's decision to change accounting methods.

Thus, he made no payments for May and June 2014, claiming a $5,000 credit for each month. In July, he paid $4,944, which represented the $5,000 payment minus the remaining $56 credit he claimed as a result of his prior overpayments.

Wife filed a petition for rule to show cause, alleging that husband was in violation of the final decree of divorce for failure to pay spousal support in months for which he had claimed the overpayment credit. Ultimately, wife argued that language in the marital agreement required that all of husband's "'work-related compensation' be included in calculating any modification to his support obligation." Thus, wife argues that the marital agreement contained an ambiguity as to what income figures were to be used in the spousal support formula, and therefore, the agreement was not self-executing because it required involvement of the circuit court to determine the correct amount of income to be plugged into the formula. For example, wife pointed out that for tax year 2013, Box 19 of husband's K-1 reflected distributions of $594,072.[4]

In response, husband filed a counter-petition for a rule to show cause. He sought enforcement of the parties' agreement by "requiring [wife's] timely adjustment of payments of spousal support to January 26, 2014 . . . ."

Beginning in October 2014, the circuit court took evidence and heard argument over several days.[5] At issue was whether husband could make the annual support adjustment without involving the court and how his income was to be determined in order to make the comparison that is

_____

[4] All of husband's K-1s from 2009 through 2013 contained different numbers in Box 1 and Box 19. For some years, Box 1 was the larger of the two dollar amounts, while in other years Box 19 was larger. In 2009, Box 1 was $544,417 and Box 19 was $599,554. In 2010, Box 1 was $444,594 and Box 19 was $533,085. In 2011, Box 1 was $508,215 and Box 19 was $431,583. In 2012, Box 1 was $568,623 and Box 19 was $530,736. In 2013, Box 1 was $129,941 and Box 19 was $594,072.

[5] Hearings were held on October 16, October 30, and November 25, 2014. The court convened counsel and announced its ruling from the bench on December 16, 2014. The court also held a hearing on January 23, 2015, because the parties could not agree on the wording of the circuit court's order.

necessary to recalculate support. He argued that, based on the formula established in the agreement, the support formula provision is self-executing and that no court action is needed, while wife asserted that the agreement was not self-executing and that "income" was undefined and ambiguous, and therefore, there was no definite number upon which appellant could rely in resetting his support payments.

Counsel submitted briefs in support of their respective positions, and the court issued its ruling from the bench on December 16, 2014.[6] The court found that the parties intended "to make the marital separation agreement self-executing" regarding the spousal support provision, but "failed to do so . . . ." The circuit court found that there was "difficulty . . . in determining what [income] figures are to be utilized when applying this formula." The court reasoned that this rendered the agreement ambiguous, noting that the ambiguity "is clear and demonstrated by the conflicting evidence in the testimony from the parties here." Having found the agreement ambiguous, the court found that it could not be self-executing, stating "because it's ambiguous it's not self-executing."

The circuit court's ruling was memorialized in a contempt order entered January 23, 2015. Specifically, the order found appellant in civil contempt "for his unilateral modification of spousal support, resulting in his failure to pay the proper amount of support . . . from April through November 2014 . . . ." The circuit court then determined that, absent further court modification or mutual agreement, husband's support obligation would continue to be $8,352 per month and, based

_____

[6] The circuit court's written order, entered on January 23, 2015, provides that the order is entered "for the reasons announced in open court on December 16, 2014 . . . ."

- 6 -

on that being the correct amount, he owed a $36,872 arrearage.[7] The court also awarded wife

$25,000 in attorney's fees.

This appeal followed, in which husband makes the following assignments of error:

> 1. The Trial Court erred in finding the parties' Agreement was not self-executing and that [husband's] adjustment of spousal support in accordance with the Agreement was a nullity . . . .

> 2. The Trial Court erred in finding that any future modification of spousal support for calendar year 2014 would not be retroactive to January 26, 2014 . . . .

> 3. The Trial Court erred in holding [husband] in contempt. [Husband] did exactly what the Agreement incorporated into the Order of Divorce instructed him to do . . . . Even if the Order of Divorce was ambiguous, doing what [husband] did was a reasonable interpretation of the Order.

Taken together, husband's three assignments of error are all tied to the question of

whether the circuit court correctly found that the support formula was not self-executing.

Husband argues that because the circuit court erred in this respect, the circuit court's rulings

regarding retroactivity and contempt are necessarily in error. For the reasons that follow, we

agree with husband.

ANALYSIS

Standard of Review

"Support agreements that are voluntarily made by the parties are subject to the same rules of

construction applicable to contracts generally." Goldin v. Goldin, 34 Va. App. 95, 107, 538 S.E.2d

326, 332 (2000) (citing Tiffany v. Tiffany, 1 Va. App. 11, 15, 332 S.E.2d 796, 799 (1985)). "When

a judgment is based upon the construction or interpretation of a contract, an appellate court is not

---

[7] Despite finding that the agreement was not self-executing, the circuit court utilized the $8,352 figure in determining the arrearage. That amount of support had never been ordered by any court and, in fact, came from the calculation the husband, under the belief that the agreement was self-executing, performed in early 2013.

bound by the trial court's construction of the contract's provisions." Nicholson v. Nicholson, 21 Va. App. 231, 239, 463 S.E.2d 334, 338 (1995). Moreover, "'on appeal if all the evidence which is necessary to construe a contract was presented to the trial court and is before the reviewing court, the meaning and effect of the contract is a question of law which can readily be ascertained by this [C]ourt.'" Dziarnowski v. Dziarnowski, 14 Va. App. 758, 762, 418 S.E.2d 724, 726 (1992) (quoting Fry v. Schwarting, 4 Va. App. 173, 180, 355 S.E.2d 342, 346 (1987)). Accordingly, "[t]he trial court's interpretation of [a support agreement] is an issue of law that we review *de novo*." Stacy v. Stacy, 53 Va. App. 38, 43, 669 S.E.2d 348, 350 (2008) (*en banc*).

"'In reviewing the agreement, we must gather the intent of the parties and the meaning of the language . . . from an examination of the *entire* instrument, giving full effect to the words the parties actually used.'" Rutledge v. Rutledge, 45 Va. App. 56, 64-65, 608 S.E.2d 504, 508 (2005) (quoting Layne v. Henderson, 232 Va. 332, 337-38, 351 S.E.2d 18, 22 (1986)). "According to the rules of construction, 'courts cannot read into contracts language which will add to or take away the meaning of words already contained therein.'" Id. at 64, 608 S.E.2d at 508 (quoting Wilson v. Holyfield, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984)).

Ambiguity

Central to the circuit court's ultimate decision was its conclusion that the spousal support provision was ambiguous. Specifically, the circuit court concluded the provision was ambiguous because the parties' disagreement to its meaning was evidenced "by the conflicting evidence in the testimony from the parties here." This was error.

A contractual provision is not rendered ambiguous simply because parties to litigation offer competing interpretations. Rather, as our Supreme Court has recently stated, "[c]ontract language is ambiguous when it may be understood in more than one way or when it refers to two or more things at the same time. Contract language is not ambiguous simply because the parties . . .

- 8 -

disagree about how to understand the language." Bartolomucci v. Fed. Ins. Co., 289 Va. 361, 370, 770 S.E.2d 451, 456 (2015) (internal citation and quotation marks omitted).

Here, although wife now contends that it is susceptible to different interpretations, the terms of the spousal support formula are sufficiently definite that there is no ambiguity. The formula requires the use of two numbers in any given year: husband's "K-1 flow through income" for the year in question is divided by husband's 2009 "K-1 flow through income." Thus, the question becomes whether the phrase "K-1 flow through income" is sufficiently definite or is ambiguous.

At the outset, we note that there are various boxes on a K-1 and that they contain various amounts. Only one, however, is entitled "ordinary business income" and that is Box 1. In contrast, Box 19, a box wife argued should play a role in the calculation for 2014, is labeled "distributions" not income. This suggests that "flow through income" as used in the agreement would be found in Box 1 and not in Box 19 or elsewhere on the K-1.

Such a view is also consistent with the generally understood meaning of "flow through income," which is the amount of income that a partner in a limited partnership will report as income when he files his income taxes, which is, of course, the amount listed in Box 1 of a K-1.[8] In short, "K-1 flow through income" is a term of art with a generally accepted meaning. In

---

[8] Although we reach this conclusion without consideration of the evidence taken in the proceedings below, we note such a view is consistent with the expert accounting testimony before the circuit court. Both husband and wife called expert accountants to testify in the proceedings below. Husband's accountant unequivocally testified that "K-1 flow through income" is understood to mean Box 1 of the K-1. Although testifying that the K-1 showed that other payments or benefits flowed from the partnership to husband in tax year 2013, wife's accounting expert did not challenge this generally understood meaning, defining "flow through income" as "generally what flows through to the [individual partner's] tax return." He then stated that "it doesn't necessarily say [taxable flow through income] in the [parties'] agreement . . . [b]ut that's generally what [flow through income] means . . ." and noted that the individual partner's taxable income "is what an accountant normally thinks of" when he speaks of flow through income.

- 9 -

interpreting contractual provisions, "[t]echnical terms or words of art will be given their technical meaning."  11 Williston on Contracts § 32:4 (4th ed. 2012); see also Roanoke v. Blair, 107 Va. 639, 641-642, 60 S.E. 75, 76 (1907) (stating that, in interpreting contractual provisions, "words of a definite legal significance, or which have a well defined primary meaning, are to be understood as used in such sense, unless there appear in the writing a manifest intention of using them in a different sense"); Doswell Ltd. P'ship v. Va. Elec. & Power Co., 251 Va. 215, 223, 468 S.E.2d 84, 89 (1996) (noting that "an agreement is not rendered ambiguous merely because it deals with a technical subject that may be considered complex to the uninformed lay person who is not familiar with the topic").  Thus, absent a manifest intention to the contrary, "K-1 flow through income" in the agreement should be interpreted to mean Box 1, ordinary business income.

Any residual doubt that this was the agreement of the parties is dispelled by the parties' inclusion of a specific figure for husband's "K-1 flow through income" in 2009, the base line year of the formula.  The parties expressly provided the figure to be utilized as the base line for the calculation, writing that the support calculation would be based upon "Husband's 2009 . . . K-1 flow through income *($544,417)* . . . ."  (Emphasis added).  It is not a coincidence that the amount in Box 1 of husband's 2009 K-1 is $544,417, and therefore, we conclude that the formula in the agreement is not ambiguous, but rather, requires the use of Box 1 of husband's K-1 in determining his support obligation.

Wife argues that additional language in the agreement renders the formula ambiguous. Specifically, she argues that language contained in a parenthetical after the formula suggests that the formula is to include all of husband's work-related income, including at least some of the distributions identified in Box 19 of the K-1.  She therefore reasons that the agreement is

- 10 -

ambiguous because it cannot be determined what the husband's income is without testimony or other evidence.

The language she cites simply does not convert the unambiguous language of the formula into an ambiguity. The agreement does provide that "(no capital gains income or other income of the Husband that is not related to his wages, bonuses or other employment related compensation shall be used in the computation of the adjustment of his spousal support obligation)." Properly understood, this language serves as a clarification that only employment related income, "his income from his W-2 salary and K-1 flow through income," as opposed to investment or other types of income, fall within the formula. It cannot properly be read as changing the recognized meaning of "K-1 flow through income" to something other than Box 1 of the K-1.

Wife also suggests that the fact that there was a significant change in husband's 2013 income as reported on Box 1 of the K-1 from the 2009 base line somehow augurs for looking to other portions of the K-1, such as Box 19, to determine husband's income for purposes of the support formula. This position has no basis in the terms of the agreement. Furthermore, as noted in footnote 4, supra, there was great variation between the amounts in Box 1 and Box 19 over the years, with Box 1 containing the larger of the two dollar amounts in some years, while in other years Box 19 contained the larger amount. In fact, for 2009, the year the parties expressly identified the "K-1 flow through income" as "$544,417, the amount found in Box 1 of the K-1, the amount reported in Box 19 was significantly larger, exceeding the total in Box 1 by more than 10%. The fact that such a discrepancy existed in the base line year and the parties specified that the figure from Box 1 of the K-1 was the proper value to use, defeats wife's attempt to create an ambiguity where none exists.

- 11 -

Because the circuit court based its finding that the support formula was not a self-executing provision on its determination that the formula was ambiguous, our conclusion that the support formula is not ambiguous removes the rationale for the circuit court's determination. Nevertheless, we must address the question of whether the provision is self-executing in the first instance because, even if the circuit court's reasoning is wrong, the judgment still can be affirmed if the correct result was reached. Perry v. Commonwealth, 280 Va. 572, 579, 701 S.E.2d 431, 435 (2010) ("Under the right result for the wrong reason doctrine, it is the settled rule that how[ever] erroneous . . . may be the reasons of the court for its judgment upon the face of the judgment itself, if the judgment be right, it will not be disturbed on account of the reasons." (alteration in original) (internal quotation marks and citations omitted)).

Self-Executing Provision

Regarding support agreements, we have held that "a provision can be self-executing only when the triggering event is empirically determined, such as a date certain, reaching a specific age, or death." Stroud v. Stroud, 54 Va. App. 231, 238, 677 S.E.2d 629, 632 (2009). In Stroud, we made clear that the listed events did not constitute an "exclusive list of empirically determined triggering events." Id. at 238 n.3, 677 S.E.2d 632 n.3. We since have explained further, in a case addressing modification of child support pursuant to an agreement, that a modification provision is self-executing when "it refers to objective standards for calculating support . . . ." Virostko v. Virostko, 59 Va. App. 816, 825, 722 S.E.2d 678, 683 (2012). We reiterated that when the provision is self-executing, "the parties need not obtain court approval for the modification legally to take effect[; but i]f the provision is not self-executing, . . . the parties must return to court to obtain approval of the modification." Id.

We find the provision at issue here to be self-executing. As noted above, the formula itself is definite and unambiguous, allowing the parties to determine the amounts to be plugged into the

formula with certainty and without the involvement of a court. Furthermore, although the exact date that the W-2 or K-1 information will be available in a given year is unknown,[9] the fact that the documents are required tax documents means that their ultimate arrival is certain. See Letter from Benjamin Franklin to Jean Baptiste Le Roy (Nov. 13, 1789), in 10 The Writings of Benjamin Franklin, 1778-1779, at 69 (Albert Henry Smith ed.) (1907) ("[I]n this world nothing can be said to be certain, except death and taxes."). Accordingly, we find that the support formula is self-executing and that husband did not need to return to court to make the adjustment to the support payment mandated by the formula.

Circuit Court's Finding of Contempt

"'[W]e review the exercise of a court's contempt power under an abuse of discretion standard.'" Zedan v. Westheim, 60 Va. App. 556, 574, 729 S.E.2d 785, 794 (2012) (quoting Petrosinelli v. People for the Ethical Treatment of Animals, 273 Va. 700, 706, 643 S.E.2d 151, 154 (2007)). "'[A] trial court by definition abuses its discretion when it makes an error of law.'" Id. (quoting Shooltz v. Shooltz, 27 Va. App. 264, 271, 498 S.E.2d 437, 441 (1998)).

As explained above, the circuit court based its finding of contempt solely on husband's "unilateral modification of spousal support, resulting in his failure to pay the proper amount of support to [wife] from April through November of 2014 . . . ." Given our conclusion that the support provision was self-executing, husband's conduct related to the payment of support did not amount to an impermissible unilateral modification of his support responsibility, but rather,

---

[9] As noted above, the parties' agreement contemplates this uncertainty by continuing the previous year's payments until the calculation for a new year can be completed with the parties applying the new figure to determine if a refund or credit is required.

complied with the parties' agreement and the final order of divorce.[10] Given our finding that

husband complied with his obligations regarding the payment of spousal support, we reverse the

circuit court's finding of contempt.

Attorney's Fees and Costs

As part of his appeal, husband requests that he be awarded "his attorney's fees and costs

incurred herein . . . ." The parties' agreement provides that

> either party shall be entitled to petition a court of competent
> jurisdiction for reasonable counsel fees incurred in securing the
> adherence of the other party to the terms of the agreement, or for any
> further legal proceedings between the parties in which the court
> determines that an award of counsel fees is warranted.

Based on the foregoing, we conclude that husband is entitled to reasonable "counsel fees" expended

in seeking the enforcement of the self-executing provision of the agreement, including counsel fees

on appeal. We remand to the circuit court for a determination of the amount of the fee award.

CONCLUSION

For the foregoing reasons, we reverse and vacate the circuit court's January 23, 2015 order

and remand the matter for further proceedings consistent with this opinion.

Reversed and remanded.

---

[10] One issue raised in the proceedings below was husband's alleged failure to comply with the provisions of the agreement requiring him to timely provide supporting documentation regarding his spousal support calculation. The circuit court, however, limited its finding of contempt to the payment of support, and therefore, that issue is not before us.

- 14 -