PRESENT:  All the Justices

APPALACHIAN REGIONAL HEALTHCARE, ET AL.

OPINION BY
v.  Record No. 161767                                        JUSTICE D. ARTHUR KELSEY
                                                                     NOVEMBER 22, 2017

JACQUELINE K. CUNNINGHAM,
COMMISSIONER OF INSURANCE, ET AL.

FROM THE STATE CORPORATION COMMISSION

The State Corporation Commission ("SCC") denied claims filed by a group of Kentucky

hospitals (the "Hospitals") requesting reimbursement for $439,375.20 in legal fees and costs

from Reciprocal of America ("ROA"), an insolvent insurer.  The Hospitals appeal, arguing that

certain agreements constituting an assumption reinsurance transaction provided a contractual

basis for the claims and that the SCC erred in concluding otherwise.  We disagree and affirm.

I.

In the late 1970s and early 1980s, a group of Kentucky hospitals created two self-insured

Trusts — the Compensation Hospital Association Trust ("CHAT") and the Kentucky Hospital

Association Trust ("KHAT") (collectively, the "Trusts").[1]  *See* 1 J.A. at 422.  CHAT provided

workers' compensation and employers' liability coverage to the Hospitals and other healthcare

providers.  KHAT provided professional liability and general liability coverage to the Hospitals

and other healthcare providers.  The Hospitals were member insureds of CHAT and KHAT.

---

[1] The 24 Hospitals that participated in this SCC case are listed in footnote 1 of the SCC's
final order.  *See In re Appalachian Reg'l Healthcare*, Case No. INS-2014-00244 (State Corp.
Comm'n Aug. 15, 2016) ("Final Order"), http://www.scc.virginia.gov/docketsearch/DOCS/
3%40%23g01!.PDF.

A. THE MERGER

In 1997, CHAT and KHAT each entered into "Master Agreements" with ROA that merged both Trusts into ROA as the surviving entity. *See id.* at 66-105, 112-50. The parties[2] executed the Master Agreements and related agreements as part of a holistic transaction and, thus, accepted that the agreements should be construed together. *See id.* at 101, 146 (incorporating exhibits into the Master Agreements).[3] The Master Agreements also stipulated that the "provisions of this Agreement were negotiated by the parties hereto and such Agreement shall be deemed to have been drafted by all of the parties hereto," *id.*, thereby seeking to avoid the application of the contra proferentem canon of construction.[4]

Accompanying each of the Master Agreements was an "Indemnification Agreement" in which ROA agreed to indemnify the Trusts for certain kinds of liabilities and expenses. *See id.* at 334-40, 342-48. In the Indemnification Agreements, ROA agreed

---

[2] CHAT, KHAT, and ROA's predecessor, The Virginia Insurance Reciprocal ("TVIR"), were the original parties to the Master Agreements and accompanying Indemnification Agreements. TVIR was a licensed Virginia insurance reciprocal that was "authorized to underwrite" professional, general, workers' compensation, and employers' liability coverage in Kentucky and other states. 1 J.A. 67-68, 113. For ease of reference, we will refer to ROA instead of TVIR.

[3] *See generally Bailey v. Town of Saltville*, 279 Va. 627, 633, 691 S.E.2d 491, 493 (2010) (stating that "where two papers are executed at the same time or contemporaneously between the same parties, in reference to the same subject matter, they must be regarded as parts of one transaction, and receive the same construction as if their several provisions were in one and the same instrument" (alteration omitted) (quoting *Oliver Ref. Co. v. Portsmouth Cotton Oil Ref. Corp.*, 109 Va. 513, 520, 64 S.E. 56, 59 (1909))); *Musselman v. Glass Works, L.L.C.*, 260 Va. 342, 346, 533 S.E.2d 919, 921 (2000) (collecting cases and stating that "[w]hen a business transaction is based on more than one document executed by the parties, we will construe the documents together to determine the intent of the parties").

[4] *See generally Doctors Co. v. Women's Healthcare Assocs.*, 285 Va. 566, 573, 740 S.E.2d 523, 526 (2013) (collecting cases and stating that "[w]e have consistently held that 'in the event of an ambiguity in the written contract, such ambiguity must be construed against the drafter of the agreement'" (alteration omitted) (quoting *Cappo Mgmt. V, Inc. v. Britt*, 282 Va. 33, 37, 711 S.E.2d 209, 211 (2011))).

to indemnify and hold harmless [each Trust] and its member-insureds from any and all Damages arising out of or in connection with the Business, the Assumed Liabilities, the conveyance and delivery of the Transferred Assets, or any related transactions, provided no such indemnification shall be provided for any and all Damages of such member-insureds relating to their obligations under their respective policies of insurance issued by [ROA]. The indemnification by [ROA] . . . shall include reasonable costs and expenses (including fees and expenses of [each Trust's] or any of its member-insured's counsel) in defending itself against any claim Damages arising from or in connection with the Damages.

*Id.* at 336, 344 (quoted verbatim in pertinent part). Several of the terms in these Indemnification Agreements had contractually defined meanings:

- "Damages" meant "any liability, expense, cost or obligation, however incurred or characterized, *assumed by* [*ROA*] as provided for in this Agreement." *Id.* (emphasis added).

- "Assumed Liabilities" included "all obligations" of the Trusts "in connection with [their] Business except for the Excluded Liabilities." *Id.* The Master Agreements clarified that ROA agreed "to assume and become responsible for all of the Assumed Liabilities at the Closing Date." *Id.* at 72, 118; *see also id.* at 176-81 ("Agreement of Assumption").

- "Business" was defined according to "the meaning set forth in the Recitals," which described the Trusts' pre-merger self-insurance business. *Id.* at 335-36, 343-44.

Because both Trusts were wholly merged into ROA, they had no separate legal existence after the merger. Neither Trust continued to conduct its pre-merger self-insurance business. The liabilities that ROA assumed included the business liabilities of the Trusts prior to the merger. In that context, the Indemnification Agreements expressly addressed legal fees. ROA agreed to indemnify the Trusts for fees and associated costs that the Trusts or any of their member insureds incurred "in defending [themselves] against any claim Damages arising from or in connection with the Damages." *Id.* at 336, 344.

3

## B. ROA IN RECEIVERSHIP

In 2003, the Circuit Court of the City of Richmond placed the financially troubled ROA into receivership and appointed the SCC as the Receiver, the Commissioner of Insurance as the Deputy Receiver, and a Special Deputy Receiver. The SCC later found ROA to be insolvent and ordered its liquidation. During the liquidation process, the Hospitals became involved in two separate judicial proceedings.

The Deputy Receiver initiated the first case ("the Virginia litigation") by filing an application with the SCC requesting authorization for ROA to continue paying workers' compensation claims that ROA had assumed from various self-insured trusts and group self-insurance associations, including CHAT and KHAT. *See id.* at 579. He filed the application because various state guaranty associations, including the Kentucky Insurance Guaranty Association ("KIGA"), had denied or were likely to deny guaranty fund coverage for these claims. *See id.*

The Hospitals joined the Virginia litigation in support of the Deputy Receiver, appearing as the "Kentucky Claimants" or the "Claimants" throughout this litigation and the receivership proceedings. *See id.* at 2-22, 380 & n.25, 382, 384, 586 & n.25, 588, 590; 2 *id.* at 667-68, 700-20, 768-69 nn.30-31, 938 n.25. After the Hearing Examiner issued his report in the Virginia litigation, the SCC adopted most of his findings, including his conclusion that "[t]he Assumed Claims constitute 'claims of other policyholders arising out of insurance contracts' pursuant to [Code § 38.2-1509(B)(1)(ii)]" and that the claims were therefore entitled to second priority in the asset distribution scheme for insolvent insurers under Code § 38.2-1509(B)(1)(ii). *See* 1 J.A. at 527-45.

4

While the Virginia litigation was pending, the Hospitals initiated the second case by filing a suit for declaratory and injunctive relief in a Kentucky trial court (the "Kentucky litigation"). *See id.* at 549-58. They claimed that because of ROA's insolvency, KIGA was responsible for the claims that ROA had assumed. The court ultimately held in favor of the Hospitals. *See id.* at 610-31. The court reasoned that, under Kentucky law, the agreements operated as a novation that extinguished all coverage liabilities of the Trusts and their member insureds and placed ROA in the Trusts' shoes as the sole source of coverage for these claims. *See id.* at 620-21.

After their victories in the Virginia and Kentucky proceedings, the Hospitals filed claims with the Special Deputy Receiver requesting payment of $439,375.20 for legal fees and costs that they had incurred in those cases. They claimed that the 1997 agreements obligated ROA to pay their fees and costs. The Special Deputy Receiver, in his initial claim determination, denied the claims, and the Deputy Receiver affirmed. The Hospitals thereafter appealed to the SCC. The SCC appointed a Hearing Examiner, who granted summary judgment to the Deputy Receiver, finding that the Indemnification Agreements did not require ROA to indemnify the Hospitals. In its final order, the SCC agreed with the Hearing Examiner and held that the Hospitals had no contractual right to reimbursement for their legal fees and costs.

II.

On appeal, the Hospitals contend that the SCC misconstrued the applicable contract provisions and that, properly construed, the provisions required ROA to indemnify them for all legal fees and costs incurred in the Virginia and Kentucky cases.[5] We disagree.

---

[5] The Hospitals support their argument with seven assignments of error. Assignment of Error 7 states:

A.

The Indemnification Agreements specifically addressed the question of indemnity for

legal fees and costs:

> The indemnification by [ROA] . . . shall include reasonable
> costs and expenses (including fees and expenses of [each
> Trust's] or any of its member-insured's counsel) in defending
> itself against any claim Damages arising from or in connection
> with the Damages.

*Id.* at 336, 344 (quoted verbatim in pertinent part). Thus, to trigger this indemnity, the Hospitals

must have incurred their legal fees and costs while "defending" themselves "against any claim"

for contractually defined "Damages." *Id.*[6]

---

> The Commission erred in its Final Order by concluding that
> because the transfer of the Assumed Claims (Liabilities) did not
> include an obligation to seek the establishment of guaranty fund
> coverage in the event of insolvency of ROA, *the Indemnification
> Agreements are not valid and therefore not enforceable* by the
> Hospitals to obtain indemnification of legal fees and expenses.

Appellants' Br. at 15 (emphasis added). The SCC, however, never held that the Indemnification
Agreements were invalid or unenforceable. Instead, the SCC found that "the plain language of
the Indemnification Agreements does not require ROA to provide indemnification for the
requested legal fees." 1 J.A. at 1022. We thus do not address Assignment of Error 7 but instead
address only the actual holding of the SCC. *See* Rule 5:21(a)(7) (requiring the assignments of
error to "identify the specific errors in the rulings below").

Similarly, Assignment of Error 4 alleges that the SCC "erred in its Final Order by ruling
that the Appellants were not afforded Class II priority pursuant to [Code § 38.2-1509(B)(1)(ii)],
as they are not claims of policyholders arising out of insurance contracts." Appellants' Br. at 14.
However, the SCC's Final Order does not contain any ruling regarding whether these indemnity
claims arise out of insurance contracts or are entitled to second priority status under Code § 38.2-
1509(B)(1)(ii), and thus we will also not consider this Assignment of Error. In any event, our
holding moots the need to address this Assignment of Error.

[6] The Hospitals do not address the point, but the record reflects that the KHAT Master
Agreement included a Kentucky choice-of-law provision, *see* 1 J.A. at 100, while the CHAT
Master Agreement included a Virginia choice-of-law provision, *see id.* at 145. Moreover, both
Indemnification Agreements also contain a Kentucky choice-of-law provision. *See id.* at 337,
345. In the absence of a showing to the contrary, we presume that foreign law — whether
applicable because of a choice-of-law clause or because of nonconsensual choice-of-law
principles — is the same as the law of the forum, which is Virginia in this case. *See Babcock &*

We begin by asking whether this contractual text has a "usual, ordinary, and popular meaning." *Babcock & Wilcox Co. v. Areva NP, Inc*., 292 Va. 165, 179, 788 S.E.2d 237, 244 (2016) (citation omitted). If so, the interpretative task is over. "When courts search for the parties' intent in an unambiguous contract provision, the search ends where it begins — with the plain, usual, and ordinary meaning of the words themselves." *Id.* at 188, 788 S.E.2d at 249. "Each party to a contract," Justice Holmes reminds us, "has notice that the other will understand his words according to the usage of the normal speaker of English under the circumstances, and therefore cannot complain if his words are taken in that sense." *Id.* (alteration omitted) (quoting Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899)).[7]

In our opinion, the plain meaning of the phrase "defending . . . against any claim," 1 J.A. at 336, 344, is that the Hospitals can seek legal fees and costs for *defending* a claim filed *by someone else* — not for *asserting* a claim *against someone else*. Neither the Virginia litigation

_____

*Wilcox Co. v. Areva NP, Inc*., 292 Va. 165, 172 n.2, 788 S.E.2d 237, 240 n.2 (2016); *Norfolk & W. Ry. v. Denny's Adm'r*, 106 Va. 383, 400, 56 S.E. 321, 327 (1907); *cf. Mountain Lake Land Co. v. Blair*, 109 Va. 147, 151, 63 S.E. 751, 752 (1909); Restatement (Second) of Conflict of Laws § 136 cmt. h (1971).

[7] Though the Hospitals and the SCC offer different interpretations of the governing contractual terms, they agree that the text is unambiguous. *See, e.g.*, Appellants' Br. at 1, 29-34; Appellees' Br. at 5-6, 13-15, 19, 21, 25; Reply Br. at 8-10.

> As we have often said, "a contract is not ambiguous simply because the parties to the contract disagree about the meaning of its language." We concede the possibility that the parties' interpretative deadlock implies the possibility that the correct meaning may be somewhere between the two. Even so, we neither presume this to be the case nor discount the possibility that it might be so.

*Babcock & Wilcox Co.*, 292 Va. at 179, 788 S.E.2d at 244 (alteration and citation omitted). Based upon our de novo review of the contractual provisions, we agree with the parties that the provisions are unambiguous, and thus, we need not resort to extrinsic evidence or to the canons of construction that are applicable to ambiguous contracts. *See TravCo Ins. v. Ward*, 284 Va. 547, 558, 736 S.E.2d 321, 328 (2012), *acq.*, 504 Fed. Appx. 251, *judgment entered*, No. 10-1710, 2013 U.S. App. LEXIS 1237 (4th Cir. Jan. 15, 2013).

nor the Kentucky litigation fits within this contractual paradigm. The Hospitals voluntarily intervened in the Virginia litigation as "Claimants." *See supra* at 4. Their goal was to support the Deputy Receiver's attempt to place the liabilities that ROA had assumed from the Trusts in line for priority status upon ROA's liquidation. In this respect, the Hospitals were not defending themselves; they were trying to moot the need to ever do so.

The same can be said of the Kentucky litigation. The Hospitals filed a declaratory judgment action against KIGA, seeking to ensure that the state guaranty association would pay the underlying workers' compensation and liability claims so that the Hospitals would not have to do so themselves. In neither case were the Hospitals defending themselves against claims asserted against them. *See* Oral Argument Audio at 6:31 to 6:43 (conceding the point in the context of workers' compensation claims).

The contractual definition of "Damages" reinforces our conclusion. The Indemnification Agreements defined "Damages" as "any liability, expense, cost or obligation, however incurred or characterized, *assumed by* [*ROA*] as provided for in this Agreement." 1 J.A. at 336, 344 (emphasis added). "Assumed Liabilities" included "all obligations" of the Trusts "in connection with [their] Business except for the Excluded Liabilities." *Id.* The Master Agreements clarified that ROA agreed "to assume and become responsible for all of the Assumed Liabilities at the Closing Date." *Id.* at 72, 118; *see also id.* at 176-81 ("Agreement of Assumption"). The Indemnification Agreements also defined "Business" according to "the meaning set forth in the Recitals," which described the Trusts' pre-merger self-insurance business. *Id.* at 335-36, 343-44.

The plain meaning of "defending . . . against any claim," *id.* at 336, 344, and the specific contractual definition of "Damages," among other terms, together support the SCC's characterization of the agreements as an assumption reinsurance transaction that effected a

8

complete novation substituting ROA for the Trusts.  In an assumption reinsurance contract, the assuming reinsurer "steps into the shoes of the ceding company with respect to the reinsured policy, assuming all its liabilities and its responsibility to maintain required reserves against potential claims.  The assumption reinsurer thereafter receives all premiums directly and becomes directly liable to the holders of the policies . . . ."  *Colonial Am. Life Ins. v. Commissioner*, 491 U.S. 244, 247 (1989), *superseded on other grounds by statute*, Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 11301(a), 104 Stat. 1388, 1388-448 (codified as amended at I.R.C. § 848(g) (2011)); *see also Hartford Fire Ins. v. California*, 509 U.S. 764, 806-07 (1993); *Jurupa Valley Spectrum, LLC v. National Indem. Co.*, 555 F.3d 87, 90 (2d Cir. 2009); *Merit Life Ins. v. Commissioner*, 853 F.2d 1435, 1436 (2d Cir. 1988), *vacated on other grounds*, 492 U.S. 902 (1989).[8]

Both textually and contextually, the indemnity provision applies only to liabilities that CHAT and KHAT had to their insureds prior to the ROA merger.  ROA's indemnity could rise

---

[8] Many commentators differentiate between an "assumption" agreement and a traditional "reinsurance" agreement.  *See, e.g.*, 7 Daniel W. Gerber et al., New Appleman on Insurance Law Library Edition § 71.02[5][d], at 71-19 (Jeffrey E. Thomas et al. eds., 2016); 1 Joseph A. Joyce, A Treatise on the Law of Insurance of Every Kind § 117, at 353-54 (2d ed. 1917); 1A Steven Plitt et al., Couch on Insurance 3d § 9:4, at 9-19 to -21 (rev. ed. 2010); William R. Vance, Handbook on the Law of Insurance § 207, at 1067, 1073 (3d ed. 1951).

We acknowledge the distinction that these authors make between pure reinsurance agreements and assumption agreements.  However, because the definitions of "assumption reinsurance" provided by the federal courts describe the nature of the agreements at issue in this case, we choose to employ the term "assumption reinsurance" with the understanding that these agreements do not amount to pure reinsurance agreements.  *See* 9 Patrick H. Cantilo et al., New Appleman on Insurance Law Library Edition § 104.04[5], at 104-110 (Jeffrey E. Thomas & Susan Lyons eds., 2016) (describing the ROA receivership and labeling the very agreements at issue here as "assumption reinsurance" transactions); *see also Wheeler v. Metteauer*, 283 S.W.2d 95, 99-100 (Tex. 1955) (observing that, in some contexts, "'[r]einsurance' is also used to denote a contract between two insurers by which one assumes the risks of the other and becomes substituted to its contracts so that on the assent of the original policyholders the liability of the first insurer ceases and that of the second is substituted," and finding that the bordereaux at issue accomplished such a substitution of liability).

no higher than the pre-merger obligations of the two Trusts — for those were the only liabilities that ROA assumed, and thus the only "Damages" for which it was responsible to indemnify the Trusts, *see* 1 J.A. at 336, 344. This contractual definition of "Damages" necessarily excludes any obligation for ROA to indemnify the Trusts and their member insureds for the legal fees and costs incurred in the Virginia and Kentucky cases.[9]

With respect to the Virginia litigation, neither Trust had any pre-merger obligation to pay legal fees and costs incurred by its member insureds in the event that they joined a receivership proceeding involving either Trust. Consequently, if there had been no merger and the Trusts had themselves become insolvent, the Hospitals would have had no contractual right to recover the legal fees and costs incurred in filing claims in the receivership proceeding and in seeking to establish the proper priority of their claims in the distribution plan. ROA, therefore, did not assume these liabilities from the Trusts because they never existed.

The same logic applies to the Kentucky litigation. Neither Trust had any pre-merger obligation to pay legal fees and costs incurred by its member insureds in the event that the member insureds, upon the liquidation of either trust, filed suit against the state insurance

---

[9] When two provisions of a contract conflict with one another, and one provision specifically addresses the dispute at hand while the other remains general, we have consistently held that the specific provision will govern over the general. *See, e.g.*, *Condominium Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 573, 709 S.E.2d 163, 170 (2011). *See generally* 2 E. Allan Farnsworth, Farnsworth on Contracts § 7.11, at 297-98 (3d ed. 2004); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 183-88 (2012). The broad and general language of the first portion of the indemnity clause does not conflict with the more specific provision limiting recovery of fees and costs to assumed liabilities because both provisions use the contractually defined term "Damages," meaning "any liability, expense, cost or obligation, however incurred or characterized, assumed by [ROA]." 1 J.A. at 336, 344. But even if these two provisions were in conflict with one another, the specific provision pertaining to the recovery of fees and costs would govern, limiting Appellants' recovery to fees and costs incurred "in defending [themselves] against any claim Damages arising from or in connection with" the liabilities "*assumed by* [*ROA*]." *Id.* (emphasis added).

10

guaranty association seeking coverage for unpaid claims. Without the merger, the Hospitals never could have initiated such litigation against KIGA because CHAT and KHAT were never members of KIGA. ROA, therefore, did not assume such liabilities because they never existed.

B.

We acknowledge but find unpersuasive the thematic counterarguments of the Hospitals. They contend that in the Virginia and Kentucky proceedings they were "defending [their] status as policyholders of ROA and their legal rights in the receivership." Appellants' Br. at 1. From this premise, they argue that the indemnity provision required ROA to pay their legal fees and costs associated with the Virginia and Kentucky cases. By "limit[ing] the definition of 'Damages' *a priori* and in isolation," the Hospitals assert, the SCC and the Deputy Receiver "simply divorce a few words from the entirety of the Agreements to support their own flawed position." Reply Br. at 4.

The thrust of the Hospitals' argument is that their participation in the Virginia and Kentucky cases was simply an effort to defend themselves against liability for unpaid claims and to protect their rights to payments from the receivership estate and to guaranty fund coverage. We see the point, which, colloquially speaking, is merely an application of the useful axiom that the best defense is a good offense. And we have no doubt that this stratagem, popular in war and game theory, may have a favored place in litigation as well.

But acknowledging the utility of the concept does not mean that we must interpret the phrase "defending . . . against any claim" by someone, 1 J.A. at 336, 344, to mean "asserting a claim" against anyone. Nor can we overlook the contractual definition of "Damages," which is limited to liabilities, costs, expenses, or obligations "assumed by [ROA]" from the Trusts at the time of the merger. *Id.* We thus do not believe that the SCC or the Deputy Receiver "simply

11

divorce[d] a few words" from the larger context of the merger transaction. Reply Br. at 4. They instead took the ordinary and plain meaning of the phrase "defending itself against any claim," 1 J.A. at 336, 344, and applied that plain meaning in light of the specific contractual definition of the word "Damages."

With their broader interpretation, the Hospitals seek to establish a contractual framework for a contingency unaddressed by any of the voluminous provisions of the various integrated agreements — indemnification for litigation in the event that ROA became insolvent. We offer no criticism of the Hospitals' proactive approach in either the Virginia or the Kentucky proceedings. Nor do we suggest that a properly drafted indemnity provision could not have shifted the responsibility for legal fees and costs in engaging in such litigation to ROA in the event of its insolvency.

That said, "[w]e have neither the duty nor the inclination to creatively construe an unambiguous contractual phrase 'so as to conform it to the court's notion of the contract the parties should have made' under the circumstances." *Babcock & Wilcox Co.*, 292 Va. at 189, 788 S.E.2d at 249 (alteration and citation omitted). Instead, our duty is "to declare what the instrument itself says it says. What the parties claim they might have said, or should have said, cannot alter what they actually said." *Id.* at 189, 788 S.E.2d at 249-50 (alteration and citations omitted).[10]

_____

[10] On brief, the Hospitals rely upon the principle that insurance policies should be interpreted in favor of insureds. *See* Appellants' Br. at 38-41. That canon of construction, however, exists in part because "[i]nsurance policies are contracts whose language is ordinarily selected by insurers rather than by policyholders" and applies only "*where there is doubt as to [the] meaning*" of the provisions and "two [contrary] constructions are equally possible." *Government Emps. Ins. v. Moore*, 266 Va. 155, 165, 580 S.E.2d 823, 828 (2003) (emphasis in original); *see also PBM Nutritionals, LLC v. Lexington Ins.*, 283 Va. 624, 634, 724 S.E.2d 707, 713 (2012) ("'*When an insurer drafts policy language* setting forth exclusions that limit coverage under a policy, the insurer is required to use language that clearly and unambiguously

III.

The SCC correctly held that the governing contractual provisions did not obligate ROA

to reimburse the Hospitals for legal fees and costs that they incurred in the Virginia and

Kentucky proceedings. We thus affirm.

*Affirmed.*

---

defines the scope of the exclusions.' Exclusionary language in an insurance policy will be construed most strongly against the insurer . . . . [But] 'where the exclusion is not ambiguous, there is no reason for applying the rules of contra proferentem or liberal construction for the insured.'" (emphasis added) (citation omitted) (quoting 2 Eric Mills Holmes & Mark S. Rhodes, Holmes's Appleman on Insurance, 2d § 7.2, at 280 (1996 & Supp. 2009))). In this case, the parties contractually stipulated that "[t]he provisions of this Agreement were negotiated by the parties hereto and such Agreement shall be deemed to have been drafted by all of the parties hereto." 1 J.A. at 101, 146. They also contend, and we agree, that the disputed provisions are not ambiguous. *See supra* note 7. The interpretative presumption favoring insureds, therefore, plays no role in our analysis.

In a related vein, Assignment of Error 2 alleges that the SCC "erred in its Final Order by ruling that the Indemnification Agreements . . . were not contracts of insurance, but contracts of indemnity." Appellants' Br. at 14. However, the SCC never made such a finding. The *Hearing Examiner* found that "[t]he Indemnification Agreements are not contracts of insurance, they are contracts of indemnity." 2 J.A. at 928. The SCC merely acknowledged, but never adopted, this finding in its Final Order. *See id.* at 1014-22. We thus decline to address this Assignment of Error. *See supra* note 5. In any event, our conclusion that the contra proferentem canon would not apply to these agreements renders this Assignment of Error moot.

13