COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, Causey and White
Argued at Alexandria, Virginia


PERSPECTA INC.

                                             MEMORANDUM OPINION[*] BY
v.       Record No. 0721-24-4           JUDGE DORIS HENDERSON CAUSEY
                                          FEBRUARY 3, 2026

ROBERT EISIMINGER, ET AL.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David A. Oblon, Judge

Attison L. Barnes, III (Kevin Maynard; Rebecca Saitta; Wiley Rein
LLP, on briefs), for appellant.

Matthew J. MacLean (Michael A. Warley; Pillsbury Winthrop
Shaw Pittman LLP, on briefs), for appellees.


Appellant Perspecta Inc. (Perspecta) appeals the circuit court's order granting over $3 million to appellees Robert Eisiminger, Justin Kuzemka, Douglas Duenkel, Daniel Duenkel, Keith McMeans, as Trustee and Settlor of the McMeans Living Trust, and Peri McMeans, as Trustee and Settlor of the McMeans Living Trust (Sellers) for breach of an Equity Purchase Agreement of the Sellers' membership interests in Knight Point Systems, LLC.  Perspecta contends that the circuit court erroneously applied a price increase based on a formula incorporated into the Equity Purchase Agreement, considered unpersuasive witness testimony, and supplanted the Equity Purchase Agreement's fee waiver by awarding attorney fees to the Sellers.  The core dispute involved "Exhibit G" to the agreement, a multi-tab spreadsheet that uses various mathematical models to adjust the sale price based on anticipated tax liability considerations.  Finding no error, we affirm the circuit court's judgment.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

Appellees Eisiminger, Kuzemka, Duenkel, Duenkel, and Keith and Peri McMeans, the Sellers, agreed to sell their membership interests in the cybersecurity company they co-founded and co-owned, called Knight Point Systems, LLC, to Perspecta, Inc.[1] After agreeing to the terms of the $250 million sale of Knight Point, Sellers sued Perspecta for breach of the parties' Equity Purchase Agreement (referred to interchangeably herein as the "agreement" or "contract"). Sellers alleged that Perspecta failed to apply a price increase based on a mathematical formula incorporated into the agreement and sought a judgment forcing the payment of an additional $3,046,632.

The core dispute involved "Exhibit G" to the agreement, a spreadsheet that tracks each part of the sale and uses several mathematical models to calculate the tax consequences of a sale of that size. One of the models used, found on Line 20,[2] adjusts the price based on anticipated tax liability considerations. Each party suggested tax models. The parties had six different models to choose from, four that Knight Point's tax accountant suggested and two that Perspecta's tax accountant suggested. In the final agreement, the parties agreed to use Exhibit G—specifically Line 20, as found by the circuit court—to calculate the needed price adjustments.

Perspecta denied owing the additional $3 million under the contract and asserted several affirmative defenses, including that Exhibit G was ambiguous and a mutual mistake by the parties. Perspecta also counterclaimed, alleging breach of contract, unjust enrichment, indemnification, and requesting specific performance.

---

[1] In July of 2021, Perspecta's name changed to Peraton Solutions Inc., but the parties preferred to use the moniker of "Perspecta, Inc." for purposes of this appeal.

[2] The Exhibit G line numbers referenced herein were created by Brian Enverso, the author of the spreadsheet, and do not reflect the existence of actual numeric line identifiers on the exhibit in the record. On brief, the parties discussed the mathematical calculations in question by referring to them as "Line 20" and "Lines 21-25." For the sake of clarity, we do the same.

During a bench trial, Brian Enverso, the Sellers' tax accountant and the author of Exhibit G, testified that Line 20 was the main calculation in the agreed-upon, underlying model used to create the numbers found in the spreadsheet. Enverso testified that he used Line 20 to calculate both the estimated amount of Incremental Section 338 Liability and the amount of the Final Incremental Section 338 Liability pursuant to Section 10.7(b) of the Equity Purchase Agreement.

Following trial, the circuit court found that Exhibit G unambiguously required the increased price as Sellers alleged. The circuit court awarded Sellers $3,046,632 and dismissed Perspecta's counterclaim; the circuit court then retained jurisdiction to address attorney fees under the agreement. By final order entered on April 2, 2024, the circuit court entered its liability judgment and granted Sellers an additional $1,474,383 in attorney fees and costs. Perspecta timely appealed, and Sellers assigned cross-error.

This appeal requires an interpretation of Section 10.7(b) and (c) of the parties' purchase agreement. Section 10.7(b) states that Perspecta would pay Sellers a good faith estimate of an additional dollar amount based on Sellers' anticipated tax liabilities, which the parties could not calculate at the time of closing. That section provides:

> Within ten (10) calendar days after the Parties have agreed to the Final Incremental Section 338 Liability (or such amount has been determined in accordance with the procedures outlined below), Buyer shall pay to the Sellers, or the Sellers shall pay to Buyer, as applicable, the difference between (i) the amount of the Incremental Section 338 Liability based upon the final Allocations (the "*Final Incremental Section 338 Liability*"), and (ii) the estimated amount previously paid to the Sellers by Buyer pursuant to this Section 10.7(b) and Section l.2(c)(vi). Set forth on *Exhibit G* is an agreed upon illustrative calculation of the estimated Incremental Section 338 Liability of the Sellers and the Company as of the Closing Date. The Parties have agreed to use the methodologies and principles reflected in *Exhibit G* for purposes of calculating both the estimated Incremental Section 338 Liability and the Final Incremental Section 338 Liability.

Section 10.7(c) then states that the parties "agree to prepare and file all applicable Tax Returns in a manner consistent with the methodologies and principles reflected in *Exhibit G* . . . and not to take any position on any Tax Return inconsistent with such methodologies and principles . . . ."

Line 20 of Exhibit G included the calculated tax liabilities for both the stock sale scenario and the asset sale scenario and was calculated once before closing (i.e., pre-tax liability) and once after closing (i.e., post-tax liability). Lines 21-25 of Exhibit G include additional estimated financial differences between the parties entering a stock sale versus an asset sale, applying a best-guess evaluation of federal tax laws. Line 21 of Exhibit G, titled "Plus(Less) s/h level (tax)/benefit on 2019 operating income/(loss)" indicates an anticipated operating loss deduction amount in the stock sale scenario of $4,366,221 and an anticipated operating loss deduction amount in the asset sale scenario of $7,840,796. Lines 21-25 were merely predictive estimates.

On brief, both parties debate the degree to which the anticipated numbers in Line 20 and Lines 21-25 reflect the required "methodologies and principles" outlined in Section 10.7(b) and (c) of the agreement, and whether the evidence at trial supported the circuit court's findings. Perspecta also argues that it was not liable for Sellers' attorney fees under the agreement's indemnification provision, Section 9.3.

In their first cross-assignment of error, Sellers argue that their personal tax returns were inadmissible on relevancy and privilege grounds. Sellers' second cross-assignment of error explicitly states that it does not challenge the circuit court's ruling on spoliation but argues that "a reversal of the judgment would cause the Sellers remediable harm because of Perspecta's spoliation." Sellers ask this Court to impose relief on that basis, should the judgment be reversed.

ANALYSIS

We view evidence in a light most favorable to and deduce all reasonable inferences for the Sellers as the prevailing party below. *Ravenwood Towers, Inc. v. Woodyard*, 244 Va. 51, 57 (1992).

Contract interpretations by the lower court are reviewed de novo. *Plunkett v. Plunkett*, 271 Va. 162, 166 (2006). When reviewing a contract, appellate courts must "construe the contract as a whole," *Doctors Co. v. Women's Healthcare Assocs.*, 285 Va. 566, 572 (2013), as to not "place emphasis on isolated terms," *Quadros & Assocs. v. City of Hampton*, 268 Va. 50, 54 (2004). There is also a presumption that no word in a contract was used needlessly. *See, e.g.*, *D.C. McClain, Inc. v. Arlington Cnty.*, 249 Va. 131, 135-36 (1995) ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it . . . .").

Whether a writing is ambiguous is a question of law also reviewed de novo. *Langman v. Alumni Ass'n of the Univ. of Va.*, 247 Va. 491, 498 (1994). But once an appellate court finds ambiguity, the construction of that ambiguous contract is a matter for the trier of fact, who examines the contract, parties' dealings, and any admitted extrinsic evidence to determine the intention of the parties. *Cascades N. Venture Ltd. P'ship v. PRC Inc.*, 249 Va. 574, 579 (1995). If the circuit court heard extrinsic evidence in court, its findings are entitled to the same weight as a jury's verdict. *RF&P Corp. v. Little*, 247 Va. 309, 319 (1994). As such, its decision will be upheld unless it appears from the evidence that the judgment is plainly wrong or unsupported by the evidence. *Id.* For instance, a trial court cannot "arbitrarily disregard" uncontradicted witness testimony that is "neither inherently incredible nor inconsistent with the facts in the record." *Street v. Street*, 24 Va. App. 2, 10 (1997).

And lastly, the amount of the attorney fees awarded by the lower court will be set aside only for abuse of discretion. *Holmes v. LG Marion Corp.*, 258 Va. 473, 479 (1999).

- 5 -

*I.  The circuit court did not err in its interpretation of the parties' Equity Purchase Agreement.*

Perspecta argues that the circuit court erred in its interpretation of the parties' Equity Purchase Agreement by not construing the contract as a whole.  Specifically, Perspecta challenges the circuit court's interpretation of the contract as entitling Sellers to the "Final Incremental Section 338 Liability" in Section 10.7(b) and claims that the circuit court failed to consider the tax benefits—the illustrative estimates of which are contemplated by Lines 21-25 of Exhibit G—that Sellers took advantage of by opting for the Section 338 Election, using Exhibit G, as dictated by Section 10.7(b).  By refusing to account for Lines 21-25, Perspecta argues that the circuit court rendered Section 10.7(c) meaningless, allowing two sets of "methodologies and principles"—one used before the sale, and another used after.  We disagree with each of Perspecta's contentions.

Virginia courts interpret unambiguous contracts by determining the plain meaning of the words in the agreement, giving terms "their usual, ordinary, and popular meaning."  *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 179 (2016) (quoting *Pocahontas Mining LLC v. Jewell Ridge Coal Corp.*, 263 Va. 169, 173 (2002)).  When the court cannot ascertain an obvious meaning from the words used in the agreement, the contract is considered ambiguous, and the court can then consider extrinsic evidence.  *RECP IV WG Land Invs. LLC v. Capital One Bank (USA), N.A.*, 295 Va. 268, 283 (2018); *Appalachian Reg'l Healthcare v. Cunningham*, 294 Va. 363, 371 n.7 (2017) ("Based upon our de novo review of the contractual provisions, we agree with the parties that the provisions are unambiguous, and thus, we need not resort to extrinsic evidence or to the canons of construction that are applicable to ambiguous contracts.").[3]

---

[3] By contrast, when a contract is ambiguous or its plain meaning is indefinite, the court must then "receive extrinsic evidence to ascertain the intention of the parties and to establish the real contract between them." *Cascades N. Venture*, 249 Va. at 579.  When reviewing extrinsic evidence, "the parties' interpretation and dealings . . . are entitled to great weight and will be

Under Code § 8.2-202, the circuit court can admit witness testimony about the parties' course of dealing[4] or performance to explain or supplement the contract. Code § 8.2-202. The circuit court can also accept any "evidence of consistent additional terms." *Id.*

Relying on the contract's plain language and witness testimony explaining the parties' course of dealings, the circuit court came to the correct conclusion that Sellers did not breach their contract with Perspecta, as Sellers properly used the pre- and post-tax filing calculations found in Exhibit G, as required by the Equity Purchase Agreement.

*A. Section 10.7(b) and the mathematic formula used in Line 20*

In complex litigation, there is a "temptation" of "draftsmanship" to ignore the plain meaning of words in highly technical agreements. *Babcock & Wilcox Co.*, 292 Va. at 180. But "complexity should not be confused with convolution, and agreements are not ambiguous simply because they deal 'with a technical subject that may be considered complex to the uninformed lay person who is not familiar with the topic.'" *Id.* (quoting *Westmoreland-LG&E Partners v. Va. Elec. & Power Co.*, 254 Va. 1, 11 (1997)). As a result, even when an agreement was "drawn unartfully," the function of the court is "to construe the contract made by the parties, not to make a contract for them." *Doswell Ltd. P'ship v. Va. Elec. & Power Co.*, 251 Va. 215, 222-23 (1996). *See also Babcock & Wilcox Co.*, 292 Va. at 180 (quoting John L. Costello, *Virginia Remedies* § 18.11[3] (4th ed. 2012)) ("It will not do that judges be deprived of their control over contracts by the assertions of a party that her technical agreement is ambiguous because she says it is . . . .").

---

followed unless doing so would violate other legal principles." *Video Zone, Inc. v. KF&F Props., L.C.*, 267 Va. 621, 627 (2004). *See also Tuomala v. Regent Univ.*, 252 Va. 368, 374 (1996).

[4] "Dealing" is defined as the "business activities or relationships that someone is involved in" or the "activity of buying, selling, or doing business with people." *Dealing*, *Black's Law Dictionary* (12th ed. 2024).

Considering these principles, parol evidence—especially when dealing with a technical subject—cannot be used to "first create an ambiguity and then to remove it." *Doswell*, 251 Va. at 223. Instead, "uncertain rights of parties may be determined and fixed by [the parties] practical dealings with each other." *Video Zone, Inc. v. KF&F Props., L.C.*, 267 Va. 621, 627 (2004) (noting that the parties' dealings can highlight for the court what each side understood the contract to mean).

In *Doswell*, a contract between Virginia Power and Doswell incorporated a mathematical formula to be used to calculate Doswell's compensation, which was to fluctuate based on the "per kilowatt" charges it incurred from transporting gas for the electric company. 251 Va. at 224. The contract then provided an "example" that illustrated how the parties were to calculate the amount of compensation due, with "estimates . . . limited by certain assumptions." *Id.* Even with this complex calculation, the court found that the contract was "clear and unambiguous" and that parol evidence should not be considered. *Id.* at 225. The circuit court in *Doswell* said, "If that [the agreement] were not clear enough in and of itself, it[ i]s made even more clear, if that[ i]s possible, in the Consent [extrinsic evidence brought in during trial]." *Id.* (first alteration in original). The Supreme Court considered this statement from the circuit court judge and found, "even assuming the Consent qualifies as prohibited extrinsic evidence, the record shows that the trial court based its judgment primarily on the agreement." *Id.*

In the current matter, Perspecta and the Sellers both assert that Line 20 and Lines 21-25, "while highly technical, have a plain meaning and, thus, should be considered unambiguous." *Babcock & Wilcox, Co.*, 292 Va. at 178. And yet, the parties each "offer very different interpretations favoring their respective views." *Id.* at 178-79. This "interpretative deadlock" does not necessitate a finding of contractual ambiguity. *Id.* at 179. The fact that the Equity Purchase Agreement between the Sellers and Perspecta was drawn unartfully does not allow the

parties to claim ambiguity in an effort to re-create their intentions on appeal. Instead, we look to the contract itself, bolstered with the testimony of Brian Enverso—the creator of the formula in Line 20 and predictive estimates in Lines 21-25 of Exhibit G—to determine the parties' practical dealings with each other.

Section 10.7(b) of the parties' Equity Purchase Agreement states: "Set forth on Exhibit G is an *agreed upon illustrative calculation* of the estimated [liability] as of the Closing Date. The Parties have agreed to use the *methodologies and principles* reflected in Exhibit G for purposes of calculating both the estimated [tax liability] *and* the Final [tax liability]." (Emphases added).

The parties agree that the phrase "methodologies and principles" refers to the calculations found in Exhibit G, which is incorporated by reference into the contract.[5] But because Exhibit G was not reformatted for a lay reader, Enverso, as author of the spreadsheet, was called as a witness to understand the calculations, as evidence of the parties' dealings—all of which was consistent with the terms of the contract. *See Doswell*, 251 Va. at 223. Enverso was asked to explain the meaning of the headings, mathematical mechanisms, and purpose of each line of Exhibit G, a multi-tab spreadsheet showing the tax impacts of the entire sale, with several models running concurrently. *See id.*; *Babcock & Wilcox Co.*, 292 Va. at 180-81. He walked the circuit court through the pre-selected mechanics and complexities of the calculations, which the parties had already agreed to use. Therefore, his testimony falls squarely within Code § 8.2-202, which allows for a contract to be "explained or supplemented" with evidence of "course of dealing" and "evidence of consistent additional terms."

---

[5] When a contract incorporates another document by reference, those documents are to be read together. *See, e.g.*, *Tuomala*, 252 Va. at 374 (applying language from faculty handbook to resolve ambiguity to faculty employment contract that mentioned said handbook); *Faison v. Union Camp Corp.*, 224 Va. 54, 59 (1982) (finding that a plat map describing the same land as described in a deed had to be considered "part of the [full deed] instrument").

And, as in *Doswell*, here, the circuit court did not rely on Enverso's testimony as proof of the parties' intentions or *why* they agreed to the calculations in Exhibit G. The circuit court based its judgment only on the contract as it was written. Perspecta's second assignment of error, in subsection (b), even concedes that the circuit court used the contract's plain language to interpret the agreement. *Accord Doswell*, 251 Va. at 225 ("[E]ven assuming the [trial evidence] qualifies as prohibited extrinsic evidence, the record shows that the trial court based its judgment primarily on the agreement . . . .").

And even if the circuit court did erroneously consider Enverso's testimony, we affirm its judgment because, under those circumstances, "the court reached the correct conclusion arguably for the wrong reason." *Id.* (citing to *Robbins v. Grimes*, 211 Va. 97, 100 (1970)). Even without Enverso's testimony, a plain reading of Sections 10.7(b) and (c) mandates that the parties had to adjust the final sale price accounting for the Sellers' tax obligations, and to do so, the parties were to utilize the calculations in Line 20 before and after the Sellers filed their tax returns. The circuit court, therefore, came to the correct conclusion that—using the same math pre- and post-tax filing—Perspecta owed whatever amount Line 20 assigned to them.

### B. Section 10.7(c) and all appropriate tax implications

Perspecta next argues that, because Sellers "fared far better with an asset sale," the calculations used in Line 20 must have been incorrect, noting that the intent of the parties was "symmetry." Perspecta claims that, because the point of the model in Exhibit G is to neutralize the costs of paying taxes during an asset sale, the numbers should have been the same before and after the Sellers paid their taxes. Even if these claims are true, we find no legal error.

Appellate courts "'cannot relieve one of the consequences of a contract merely because it was unwise' . . . [or] 'rewrite a contract simply because the contract may appear to reach an unfair result.'" *Pelfrey v. Pelfrey*, 25 Va. App. 239, 245 (1997) (alterations in original) (quoting

*Rogers v. Yourshaw*, 18 Va. App. 816, 823 (1994)).  Therefore, without any proof of unconscionability in the record, we cannot relieve Perspecta from its contractual obligations just because the Sellers had a better substantive outcome.

The contract expressly says that Lines 21-25 are "illustrative" of future tax implications.  As discussed above, the parties contracted to use the formula in Line 20, and Line 20 was in fact used.  That the sellers fared better than Perspecta predicted following the sale of Knight Point is not a breach of the contract.  There were six models suggested for the parties to choose from when negotiating the Equity Purchase Agreement, and the parties agreed to the model that later became Exhibit G.  There is no evidence in the record that suggests the Sellers misused Exhibit G or took tax positions in a way that was contrary to the agreement.  Therefore, the circuit court did not err in finding that Perspecta owed the additional $3 million to the Sellers, as dictated by the agreed-upon calculations in Exhibit G's Line 20.

II.  *The circuit court did not err by considering Enverso's testimony.*

Perspecta further argues that the circuit court erred in ignoring Lines 21-25 of Exhibit G because "the inclusion of Schedule G in the contract is more persuasive than Buyer Perspecta's extrinsic evidence of the intent of the parties."  Specifically, Perspecta claims that Enverso was not a party to the litigation, because he was not a Seller, and therefore cannot testify as to the parties' intent.  Perspecta further claims that, because only one Seller read the contract and found it "confusing," the Sellers did not meet their burden of proof to show their intent.

We do not see a need to contend with this argument, as Perspecta concedes that the circuit court did not rely on Enverso's testimony regarding the Sellers' intent and instead focused only on the contract language and the inner workings of Exhibit G.  The contract is not ambiguous.  Its language is clear: Lines 21-25 are "illustrative."  Therefore, we find no error in the circuit court's decision regarding Perspecta's second and third assignments of error.

*III. The circuit court did not err by granting the Sellers' attorney fees.*

Perspecta finally argues that the circuit court erred in awarding attorney fees to the Sellers because the parties' bargained-for agreement included a Representative Fund to cover the costs of litigation. Relying on Subsections 11.17(c)(v) and 11.17(c)(xii) of the contract that state that Sellers must hire counsel and litigate "solely at the cost, risk and expense of the Sellers," Perspecta argues that Sellers shifted that risk in breach of the contract. Here, the circuit court correctly found that the Sellers did not waive attorney fees.

We must still review de novo all fee waivers or indemnification clauses as part of the whole contract. Section 9.3(b) of the Equity Purchase Agreement clearly indemnifies the Sellers. (Perspecta shall "indemnify, defend and hold harmless the Sellers . . . from and against any and all Damages arising out of . . . any breach by the Buyer . . . ."). The contract definitions section defines "Damages" as "court costs and reasonable attorneys', consultants', experts' and other professional advisors' fees." Put simply, the plain meaning of Section 9.3(b) requires that Perspecta pay attorney fees.

Instead of a straightforward reading of the contract as a whole, Perspecta isolates Section 11.17 of the contract, which instructs the Sellers to hire a Sellers' Representative to represent the interests of the owners of Knight Point through the sale of their company. A plain reading of Section 11.17(c)(v) stipulates that the Sellers would bear the cost of the Representative's work on their behalf. The provision protects the Representative of the Sellers from personally bearing the cost of the actions he took on behalf of the Sellers, not from the costs of litigation itself. Perspecta's suggested reading of Section 11.17 would negate any need for Section 9.3, ignoring the mandate from *Doctors* and *Quadros*—to read contracts as a whole—and *D.C. McClain*—that there are no needless words in written contracts. *Doctors*, 285 Va. at 572-73; *Quadros*, 268 Va. at 54; *D.C. McClain*, 249 Va. at 135-36.

- 12 -

Regarding the amount of the fee award, the trier of fact must "weigh the testimony of attorneys as to the value of the services, by reference to their nature, the time occupied in their performance, and other attending circumstances, and by applying to it their own experience and knowledge of the character of such services." *Holmes*, 258 Va. at 479 (quoting *Beale v. King Administratrix*, 204 Va. 443, 446 (1963)). Given that the circuit court judge in Fairfax is the one who (1) heard the testimonies of the attorneys, (2) received a more detailed account of the services the attorneys in the present case provided, and (3) understands the work of lawyers in that region of Virginia, we cannot say that the lower court abused its discretion in setting the relevant fee amount. Therefore, we see no need to modify the award of $1,474,383.

*IV. The appellee's cross-errors need not be addressed under the doctrine of judicial restraint.*

Because we presently affirm the lower court in the Sellers' favor, we need not reach the appellees' cross-assignments of error regarding the admissibility of Sellers' tax returns as evidence. *See Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) ("As we have often said, 'the doctrine of judicial restraint dictates that we decide cases "on the best and narrowest grounds available."'" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))).

CONCLUSION

We find that the circuit court did not err in requiring Perspecta, Inc. to apply a price increase based on a formula incorporated into the Equity Purchase Agreement, totaling an award of an additional $3,046,632 (plus six percent interest per year on that amount going forward from January 27, 2023). Nor did the circuit court err in requiring Perspecta, Inc. to pay an additional $1,474,383 in attorney fees. As such, we affirm the circuit court's judgment.

*Affirmed.*

- 13 -